## CLIFFS SYNFUEL CORPORATION, a Utah corporation, Plaintiff–Appellee,

v.

Gale NORTON, Secretary of the United States Department of the Interior, Nina Hatfield, Acting Director, Bureau of Land Management, United States Department of the Interior, Sally Wisely, Director, Utah State Office, Bureau of Land Management, United States Department of the Interior, The Department of the Interior of the United States, Defendants–Appellants.

Crippled Horse Investments, LP; Estate of Frederick H. Larson; Phillips 66 Company; Exxonmobil Corporation, Amici Curiae.

No. 01–4063.

United States Court of Appeals, Tenth Circuit.

May 31, 2002.

Lisa E. Jones, Attorney, (Gary B. Randall, Attorney, and Katherine W. Hazard, Attorney, Environment & Natural Resources Div., Department of Justice, Washington DC; John Cruden, Acting Assistant Attorney General, Washington, DC; Paul M. Warner, United States Attorney and Jeffrey E. Nelson, Assistant United States Attorney, Salt Lake City, UT; Karen Hawbecker and David K. Grayson, Office of the Solicitor, U.S. Department of the Interior, Washington, DC, with her on the briefs) for Defendants–Appellants.

Robert G. Pruitt, Jr., (Michael S. Johnson and Shawn T. Welch, with him on the brief) Pruitt, Gushee & Bachtell, 1850 Beneficial Life Tower, Salt Lake City, UT, for Plaintiff–Appellee.

James A. Clark of Baker & Hostetler LLP, Denver, CO, for amicus ExxonMobil Corporation; and Donald L. Morgan of Cleary, Gottlieb, Steen & Hamilton, Washington, DC, for amici Crippled Horse Investments, LP, Estate of Frederick H. Larson, and Phillips 66 Company, filed an amici curiae brief.

Before TACHA, Chief Judge, and ALDISERT * and SEYMOUR, Circuit Judges.

ALDISERT, Circuit Judge.

This appeal by Gale Norton, Secretary of the Interior, from a summary judgment in favor of Cliffs Synfuel Corp. ("Appellee"), requires us to decide whether the district court properly construed provisions of the General Mining Law of 1872, 30 U.S.C. §§ 21, *et seq.* ("Mining Law"), and the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181 *et seq.* ("Leasing Act"), in light of the Court's interpretation of these statutes in *Hickel v. Oil Shale Corp.*, 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970). Specifically, we must determine whether Cliffs Synfuel Corp. performed the requisite annual assessment work on its location in order for it to qualify under the savings clause of the Leasing Act. "Assessment work" is defined as "the annual work upon an unpatented mining claim on the public domain necessary under the U.S. law for the maintenance of the possessory title thereto." WEBSTER'S THIRD NEW INT'L DICTIONARY OF THE ENGLISH LANGUAGE, UNABRIDGED (1968).

## I.

### A.

The Green River Formation, located in eastern Utah, is the site of potentially valuable oil shale deposits. "Oil shale is a sedimentary rock containing an organic material called kerogen which, upon destructive distillation, produces a substantial amount of oil." *Andrus v. Shell Oil Co.*, 446 U.S. 657, 659 n. 3, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980). Once mined, oil shale can be a valuable fossil fuel. This case involves an attempt by Cliffs Synfuel Corp. to patent four oil shale mining claims in Uintah County, Utah, which encompass approximately 520 acres of the Green River Formation.

Congress enacted the General Mining Law of 1872, which essentially gave away valuable mineral deposits, including oil shale deposits, to whomever first located them. The law was premised on a policy

---

* Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

of encouraging exploration of valuable mineral deposits in the western United States. Utilizing the terminology of mining custom, the Mining Act provides that one who claims a mineral deposit is known as a "locator" and is required to perform a certain amount of work each year in prosecution of the claim site, known as the "location." The Act describes this "assessment work:"

> All records of mining claims made after May 10, 1872, shall contain the name or names of the locators, the date of the location, and such a description of the claim or claims located by reference to some natural object or permanent monument as will identify the claim. On each claim located after the 10th day of May 1872, and until a patent has been issued therefor, not less that $100 worth of labor shall be performed or improvements made during each year. . . .

30 U.S.C. § 28.

If a claimant failed to perform such work for a period and then later "resumed" work before anyone else asserted a claim on the same land, his claim remained intact. This became known in later years as the "resumption doctrine:"

> [U]pon a failure to comply with these conditions, the claim or mine upon which such failure occurred shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location.

*Id.*

Congress enacted the Mineral Leasing Act in 1920, which "completely changed the national policy over the disposition of oil shale lands." *Hickel*, 400 U.S. at 51, 91 S.Ct. 196. Thereafter, one could no longer simply explore the land, stake a claim and allege title in every situation. Rather, lands containing certain valuable mineral deposits, including oil shale, came within the dominion of the United States and could be offered to the public only through lease from the government.[1]

---

1. A description of oil shale mining claim activity before and subsequent to the passage of the Mineral Leasing Act of 1920 is set forth in the Secretary of the Interior's Petition for a Writ of Certiorari to the United States Court of Appeals for the Tenth Circuit in the *Hickel* case:

> At the time, [prior to 1920] there was a great deal of public excitement about oil shale; the nation's known crude oil resources were severely limited, and it therefore seemed that oil shale would soon be required to satisfy the demand for petroleum products. Interest in oil shale flagged, however, when substantial deposits of crude oil were found; thousands of oil shale claims were abandoned and forgotten by the original locators. Before passage of the Mineral Leasing Act of 1920, failure to do assessment work meant that another prospector could locate the claim himself. When that Act withdrew the land from further location, however, the threat of "top-filing," [sic] tending to enforce the assessment work requirement, was no longer present. Given this fact, the sudden disappearance of interest in oil shale claims, and the congressional mandate to reserve oil shale land for leasing, the Secretary determined to treat the failure to do assessment work as forfeiting the claim, so that the land could be put to other uses in the public interest.
>
> Proceedings against such claims began in the late 1920's, and took on substantial proportions. Investigation showed more than 30,000 oil shale claims, embracing more than 4,000,000 acres of public domain in Colorado, Utah and Wyoming, which were not being maintained by the performance of annual assessment work. In the fiscal year ending June 30, 1932, the Secretary declared 10,918 locations, embracing 1,294,500 acres, null and void; and in fiscal 1933, 11,146 locations embracing 1,448,980 acres were cancelled. It is apparent from the volume of claims disposed of that the great majority of the mining claimants must have defaulted, taking no

However, § 37 of the Act contained a "savings clause" which left intact those claims for oil shale which were already in existence as of February 25, 1920, so long as such claims were "thereafter maintained in compliance with the laws under which initiated...." 30 U.S.C. § 193.

The Leasing Act provides in pertinent part:

The deposits of coal, phosphate, sodium, potassium, oil, oil shale, and gas, herein referred to, in lands valuable for such minerals, ... shall be subject to disposition only in the form and manner provided in this chapter, [by lease only] ... except as to valid claims existent on February 25, 1920, and thereafter maintained in compliance with the laws under which initiated, which claims may be perfected under such laws, including discovery.

*Id.*

Thus, if one had a claim that existed prior to February 25, 1920, the claimant would not be required to lease the claimed land from the government, but could perfect title to it so long as the claim was maintained pursuant to pre 1920 law. "Discovery of a 'valuable mineral' is not the only prerequisite of patentability. The mining law also provides that until a patent is issued a claimant must perform $100 worth of labor or make $100 of improvements on his claim during each year...." *Andrus*, 446 U.S. at 658 n. 1, 100 S.Ct. 1932 (citing 30 U.S.C. §§ 28, 29).

The dispute before us centers on this savings clause in which former locators of a claim were grandfathered in, provided

action to protect their interest in what then appeared to be worthless property. Indeed, of the claims involved in this case, only the then holders of the claims now made by respondent Brown appealed the cancellation within the administrative process; when that administrative appeal was lost, no effort was made to seek judicial review. The infrequency with which judicial review was sought is striking when it is considered that, when sought, it succeeded. In January, 1930, this Court held in *Wilbur v. Krushnic*, 280 U.S. 306, 50 S.Ct. 103, 74 L.Ed. 445, that the Secretary could not cancel a claim where assessment work had lapsed for a year, but had been resumed before any administrative action had been undertaken against the claim. That decision left open the question whether cancellation would be proper where the Secretary took affirmative action against a claim after a lapse in assessment work and before resumption. The Secretary promptly began to take such action, posting property with challenges to the claims when it was determined that assessment work had not been done during an immediately preceding year. The massive and basically unopposed clearance of claims described above then took place.

Among the few who contested these proceedings were the claimants in *Virginia–Colorado, supra,* who appear to have omitted their assessment work for only fifteen months preceding the Secretary's action, and who alleged in their papers that they stood ready to resume it but for the Secretary's cancellation of their claim. In 1935, as already indicated, they brought their challenge to this Court, which ruled that even in a contest brought prior to resumption of assessment work, failure to do that work for a year was not a valid reason to cancel the claim and that, in doing so, the Secretary "went beyond the authority conferred by law." 295 U.S. at 647, 55 S.Ct. 888. The Secretary promptly "overruled" the contrary administrative decisions, *The Shale Oil Company,* 55 I.D. 287, vacated pending cancellation proceedings, and for a time stood ready to reopen cancellations which had already been made final. It appears that only about 74,000 acres of the several million involved were reclaimed in this fashion.

With the recent revival of interest in oil shale, speculators and others have been buying up the old, cancelled claims....

Petition for a Writ of Certiorari to the United States Court of Appeals for the Tenth Circuit at 3–6, *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970), reprinted in Appellant's Supp.App. at 427–431 (original record citations omitted).

they qualified. The Secretary contends that Appellee's purported claim does not come within the purview of this exception to the Leasing Act. The district court disagreed and entered judgment in favor of Appellee. The issue is now joined before us.

**B.**

In 1989, Cliffs Synfuel Corp. filed a mineral patent application with the Utah State Office of the Bureau of Land Management ("USO/BLM") covering four oil shale mining claims, which were originally located in 1917. On October 9, 1992, USO/BLM issued a First Half/Mineral Entry Final Certificate ("Final Certificate") and on February 26, 1993, transmitted the application to a BLM certified mineral examiner in Vernal, Utah, for a field inspection and Mineral Report. The Mineral Report was issued on June 18, 1996. A government contest was initiated by USO/BLM against all four claims alleging (1) lack of discovery on or before February 25, 1920, (2) lack of discovery at the present time, and (3) failure of the claim owners to comply with the annual assessment work required in 30 U.S.C. § 28. On the basis of these charges, USO/BLM requested that all four claims be declared invalid and cancelled.

A two-day evidentiary hearing in Salt Lake City was held on December 15 and 16, 1997, before an Administrative Law Judge ("A.L.J.") of the Interior Department's Office of Hearings and Appeals.

Appellee presented testimony and evidence supporting its position that the required "discovery" had been timely on each claim, and that annual assessment work, which had been non-existent for 46 years, had resumed in 1977 in satisfaction of the resumption doctrine codified at 30 U.S.C. § 28.

The A.L.J. determined that all four of Appellee's claims met the standards for "discovery" under the law as it existed both in 1920, as well as the present. He thus rejected the government's two discovery challenges. However, the A.L.J. determined that the four claims were still invalid for failure to comply with the annual assessment work requirement of 30 U.S.C. § 28. In so ruling, he relied on the Interior Department's Interior Board of Land Appeals ("IBLA" or "Board") decision in *United States v. Herr*, 130 IBLA 349, 101 I.D. 113 (1994) to conclude that in light of *Hickel*, the Appellee did not meet the statutory requirements.

Cliffs Synfuel Corp. appealed the A.L.J.'s decision to the Board, asserting that the resumption doctrine was still in effect in 1977—the year the claim owner resumed assessment work, after 46 years of inactivity. An Administrative Judge of the Board affirmed the A.L.J.'s ruling.

Appellee thereafter filed a complaint in the district court for a review of the Board's final order, as authorized by the Administrative Procedure Act, 5 U.S.C. §§ 701–706.[2] Appellee requested that the

---

2. Appellee was entitled to seek an injunction and other relief in the district court.

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction.

5 U.S.C. § 703.

Where jurisdiction for the review of agency action is exclusively in the courts of appeals, "[r]eview of an agency order is commenced by filing ... a petition for review with the clerk of a court of appeals authorized to review the agency order." Rule 15(a)(1), Federal Rules of Appellate Procedure. *See also Dillard v. U.S. Dep't of Hous. and Urban Dev.*, 548 F.2d 1142, 1143 (4th Cir.1977) (Per curiam).

court reverse the agency action on the ground that its decision was arbitrary, capricious and otherwise inconsistent with current law. The district court granted the relief, concluding that the Board had misinterpreted the *Hickel* decision:

> In sum, *Hickel* does not hold that failure to do assessment work, even substantial noncompliance with the assessment requirement, is somehow self-effectuating, or results in the *ipso facto* loss of rights under a pre 1920 mining claim. Rather, the *Hickel* decision stands for the proposition that the Department of the Interior has standing to challenge the holder of oil shale mining claims for failure to substantially comply with the assessment requirements. The IBLA Decision, following *Herr*, seemingly discarded § 28 and § 193's straightforward language to reach an alternative, strained, and erroneous reading of *Hickel*. This was arbitrary, capricious, and an abuse of discretion.

*Cliffs Synfuel Corp. v. Babbitt*, 147 F.Supp.2d 1118, 1125 (D.Utah 2001).

In reaching its conclusion the court held that although Appellee failed to perform the necessary annual statutory assessment work for 46 years, as mandated by 30 U.S.C. § 28, its resumption of assessment work in 1977, before the initiation of a government contest action, cured the 46 year lapse. The court concluded that the four claims were valid and in good standing and granted Appellee's Motion for Summary Judgment, vacated the Board's decision, and directed the Department of the Interior to diligently process patents for the claims. This appeal followed.

### C.

In her appeal, the Secretary contends that the district court failed to respect the fundamental interpretation of § 28 and § 193 as set forth in *Hickel* in the follow-ing discrete particulars: (1) the necessity for the claimant to perform annual assessment work each year; (2) that "token assessment work, or assessment work that does not substantially satisfy the requirements of 30 U.S.C. 28, is not adequate to 'maintain' the claims within the meaning of § 37 of the Leasing Act." *Hickel*, 400 U.S. at 57, 91 S.Ct. 196; and, most important for our purposes, (3) that by the terms of the Mineral Leasing Act of 1920, the United States becomes the beneficiary of all pre 1920 oil shale mining claims that are invalidated because of a failure to perform the annual assessment work for a *substantial* period of time. The Secretary argues that the effect of this, insofar as oil shale mining claims are concerned, is that where there has been a history of decades of failure to respect the annual assessment requirements, the savings clause exception of Mineral Leasing Act of 1920 does not apply.

### II.

This appeal concerns a federal question arising under the provisions of the General Mining Law of 1872, 30 U.S.C. §§ 21, *et seq.*, the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181, *et seq.*, and the Administrative Procedure Act, 5 U.S.C. §§ 701–706. Consequently, the United States District Court for the District of Utah had jurisdiction of the underlying action pursuant to 28 U.S.C. § 1331. This court has appellate jurisdiction pursuant to 28 U.S.C. § 1291(a)(1), which provides for jurisdiction of appeals from district court interlocutory orders granting injunctions.

### III.

 "[I]n reviewing a district court's review of an agency decision, the identical standard of review is employed at both levels; and once appealed, the district court's decision is accorded no particular

deference." *Valley Camp of Utah, Inc. v. Babbitt*, 24 F.3d 1263, 1267 (10th Cir.1994) (internal quotation marks and citations omitted). The district court's granting of summary judgment is reviewed *de novo*. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990).

■■■ Under the Administrative Procedure Act, in reviewing the underlying agency decision denying Appellee's application for a patent, the standard is whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The duty of a court reviewing agency action under the 'arbitrary or capricious' standard is to ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir.1994) (footnote omitted). In reviewing the agency's explanation, the reviewing court must determine "whether the agency considered all relevant factors and whether there has been a clear error of judgment." *IMC Kalium Carlsbad, Inc. v. Interior Bd. of Land Appeals*, 206 F.3d 1003, 1012 (10th Cir.2000) (quoting *Olenhouse*, 42 F.3d at 1574). However, "the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

■■ Additionally, when reviewing an agency's interpretation of a statute that it administers, a court must apply the two-step analysis set forth by the Court in *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). This court has interpreted *Chevron* as follows:

> When reviewing an agency's interpretation of a statute it administers, we first determine whether the statute is unambiguous. If the intent of Congress is clear then we must give effect to that intent. The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If, however, the statute is ambiguous or silent on the issue in question, we must determine whether the agency's determination is based on a permissible construction of the statute. If so, we will defer to the agency's interpretation.
>
> In determining the meaning of a statute, we look at not only the statute itself but also at the larger statutory context. We may ascertain the intent of Congress through statutory language and legislative history.

*Osborne v. Babbitt*, 61 F.3d 810, 812 (10th Cir.1995) (quoting *Utah v. Babbitt*, 53 F.3d 1145, 1148 (10th Cir.1995) (internal quotation marks and citations omitted)).

We now turn to the *Hickel* Court's interpretation of the Mining Act of 1872 and the Mineral Leasing Act of 1920.

## IV.

The enactment of the Mineral Leasing Act of 1920 marked a "complete[ ] change[ ][in] the national policy over the disposition of oil shale lands." *Hickel*, 400 U.S. at 51, 91 S.Ct. 196. The Act removed oil shale (and other specified minerals) from subsequent location and private appropriation under the General Mining Law of 1872. "Thereafter such lands were no longer open to location and acquisition of title but only to lease." *Id.*

The Act provides:

> Any person having a valid claim to [oil shale] under existing laws on January 1, 1919, shall, upon the relinquishment of such claim, be entitled to a lease under the provisions of this section for such

area of the land relinquished as shall not exceed the maximum area authorized by this section to be leased to an individual or corporation.

30 U.S.C. § 241. The relinquishment may be resurrected, however, under the "savings clause" of the Act if the claim was valid prior to February 25, 1920, "and thereafter maintained in compliance with the laws under which initiated, which claims may be perfected under such laws, including discovery." 30 U.S.C. § 193.

In *Hickel,* the Court addressed the interrelationship of these two statutes and supplied the answers to two questions, which we must now consider in the resolution of this case: (1) what is the nature of the "assessment work" required to be taken by claimants for their claims to be "thereafter maintained;" and (2) what role is assigned to the United States when the claimants fail to satisfy those requirements?

Prior to *Hickel,* the Court had taken the view that, even after the enactment of the Mineral Leasing Act, an owner of a pre 1920 oil shale claim was under no obligation to perform the requisite assessment work on an annual basis so long as they were able to avail themselves of the resumption doctrine before the claim was relocated by a subsequent claimant. *Wilbur v. Krushnic,* 280 U.S. 306, 317, 50

S.Ct. 103, 74 L.Ed. 445 (1930). Moreover, defaults in assessment work did not mandate that the lands subject to oil shale claims be automatically returned to the government. Instead, the Court intimated that failure to perform assessment work made the claims subject to relocation only by third parties but that "[s]o far as the government was concerned, failure to do assessment work for any year was without effect." *Ickes v. Virginia–Colorado Dev. Corp.,* 295 U.S. 639, 645, 55 S.Ct. 888, 79 L.Ed. 1627 (1935) (citing *Krushnic,* 280 U.S. at 317, 50 S.Ct. 103).

The Court radically altered these two concepts in re-examining the Leasing Act's effect on pre–1920 oil shale clams in *Hickel,* a case in which oil shale claimants sued the Department of the Interior seeking a reinstatement in the late 1950's [3] of claims "cancelled in the early 1930's on the ground that the amount of labor or improvements specified in § 28 had not been made 'during each year.'" *Hickel,* 400 U.S. at 50, 91 S.Ct. 196. The Court first rejected its earlier formulations that had declared the government to be a disinterested party, unable to assert rights to a pre–1920 oil shale claim upon which assessment work had been discontinued. It stated that "if we assume, *arguendo,* that failure to do assessment work as provided in the 1872 Act concerned at the time only

**3.** The precise time frame is delineated in the Secretary of the Interior's Petition for a Writ of Certiorari to the United States Court of Appeals for the Tenth Circuit in *Hickel:*

Respondents are the present owners of claims to oil shale mining locations in Colorado. These claims were cancelled by the Secretary of Interior in 1928–1931 when he determined that the then owners of the claims had failed to meet a statutory obligation to do assessment work—$100 annual labor or improvements on each claim—as required by 30 U.S.C. 28. In 1935, this Court held that the requirement of assessment work could not be used as a ground for cancellation by the government, but was

significant only for the purpose of determining rights to the claim as between competing prospectors. *Ickes v. Development Corp. (Virginia-Colorado),* 295 U.S. 639, 55 S.Ct. 888, 79 L.Ed. 1627. The present claims were not involved in that case, and no attempt was made then, or until the late 1950's, to revive them. They remained cancelled on the Department's records.

Petition for a Writ of Certiorari to the United States Court of Appeals for the Tenth Circuit at 2, *Hickel v. Oil Shale Corp.,* 400 U.S. 48, 91 S.Ct. 196, 27 L.Ed.2d 193 (1970), reprinted in Appellant's Supp.App. at 427 (original record citations omitted).

the claimant and any subsequent relocator, the United States, speaking through the Secretary of the Interior, became a vitally interested party by reason of the 1920 Act." *Hickel,* 400 U.S. at 53, 91 S.Ct. 196. Further, the Court said:

> If we were to hold to the contrary that enforcement of the assessment work of § 28 was solely at the private initiative of relocators, the "maintenance" provision of § 37 becomes largely illusory, because relocation of oil shale claims became impossible after the 1920 Act. So if enforcement of the assessment work requirement of § 28 were dependent solely on the activities and energies of oil shale relocators, there was no effective enforcement device.

*Id.* at 56, 91 S.Ct. 196.

The Court then delineated what actions are required to "thereafter maintain" an oil shale claim:

> We agree with the Court in *Krushnic* and *Virginia–Colorado* that every default in assessment work does not cause the claim to be lost. Defaults, however, might be the equivalent of abandonment; and we now hold that token assessment work, or assessment work that does not substantially satisfy the requirements of 30 U.S.C. § 28, is not adequate to "maintain" the claims within the meaning of § 37 of the Leasing Act. To hold otherwise would help defeat the policy that made the United States, as the prospective recipient of royalties, a beneficiary of these oil shale claims. We cannot support *Krushnic* and *Virginia–Colorado* on so broad a ground. Rather, their dicta to the contrary, we conclude that they must be confined to situations where there had been substantial compliance with the assessment work requirements of the 1872 Act, so that the

"possessory title" of the claimant, granted by 30 U.S.C. § 26, will not be disturbed on flimsy or insubstantial grounds.

*Id.* at 57, 91 S.Ct. 196.

From the Court's statement "that *every* default in assessment work does not cause the claim to be lost," it logically follows that in each case we must consider the quantum of the actual assessment work performed and the length of time the claimant failed to meet the annual assessment work required by the Mining Act of 1872.[4]

The Court set forth the template in *Hickel.* It noted that in the case before it, the claims had been "cancelled in the early 1930's on the ground that the amount of labor or improvements specified in § 28 had not been made 'during each year.'" *Hickel,* 400 U.S. at 50, 91 S.Ct. 196. Some twenty years would pass before the claimants re-asserted their right to these claims and during this period they performed no assessment work. Annual assessment work had basically ceased prior to the 1930's as well as in the twenty years thereafter. It was this long period of inactivity that influenced the Court to distinguish the facts in *Hickel* from those in *Krushnic* and *Virginia–Colorado.* By way of contrast, in *Krushnic,* the Court held that the Secretary could not cancel a claim where assessment work had lapsed *for only a year.* The Court reached a similar decision in *Virginia–Colorado,* where the claimants had performed assessment work from 1917 to 1930 and omitted assessment work *for only fifteen months* preceding the Secretary's action. Moreover, when the assessment work ceased in 1931, the claimant had stated its intention and made arrangements to resume assessment work

---

4. In so framing our path of inquiry, we perforce reject the more sweeping statement in *United States v. Herr,* that "the resumption doctrine was no longer applicable to oil shale claims." *Herr,* 130 IBLA 349, 367 (1994).

shortly thereafter. *Virginia–Colorado,* 295 U.S. at 643, 55 S.Ct. 888.

## V.

In determining where the axe will fall in the case at bar, it is obvious that the facts here are decidedly more similar to the situation which confronted the Court in *Hickel,* rather than in *Krushnic* or *Virginia–Colorado.* It is undisputed that for almost five decades Appellee failed to perform any assessment work on the four claims. The A.L.J. determined that assessment work was properly performed from 1918–1930 and from 1977–1992. However, he also found that no assessment work affidavit was filed with the county office and no assessment work was performed during the 46–year period stretching from July 1, 1931 to September 1, 1977. Under these circumstances our decision is driven by the facts and reasoning set forth in *Hickel.*

*Krushnic* is an example of an earlier view of the role of the government in oil shale cases. There the Court held that the government was required to actively step in and challenge a delinquent claim before it could take possession.

> While [a claimant] is required to perform labor of the value of $100 annually, a failure to do so does not *ipso facto* forfeit the claim, but only renders it subject to loss by relocation .... and we think it is no less clear that after failure to do assessment work, the owner equally maintains his claim, within the meaning of the Leasing Act, by a resumption of work, unless at least some form of challenge on behalf of the United States to the valid existence of the claim has intervened ...

*Krushnic,* 280 U.S. at 317–318, 50 S.Ct. 103.

This statement was the polestar of the district court's approach to this case. The court was of the view that divestment of an oil shale claim "could only occur upon the simultaneity of the claim holder's failure to maintain *and* the subsequent relocation of the claim by a third person." *Cliffs Synfuel Corp.,* 147 F.Supp.2d at 1124 (emphasis in original). It noted that under 30 U.S.C. § 28, "[o]ne can redeem a claim by resuming performance of the necessary labor or improvement to the claim before another person 'relocates' the claim." *Id.* at 1122. Therefore, because Appellee had resumed annual assessment work in 1977, before the government had undertaken any action, the district court opined that the four oil shale claims were valid and in good standing.

But the *Krushnic* statement, (later described by the Court in *Hickel* as dicta) relied upon by the district court, and the anchor of Appellee's defense of the district court's judgment in its favor, tracked too broad a compass:

> We cannot support *Krushnic* and *Virginia–Colorado* on so broad a ground. Rather, their dicta to the contrary, we conclude that they must be confined to situations where there had been substantial compliance with the assessment work requirements of the 1872 Act, so that the "possessory title" of the claimant, granted by 30 U.S.C. § 26, will not be disturbed on flimsy or insubstantial grounds.

*Hickel,* 400 U.S. at 57, 91 S.Ct. 196.

In its more precise approach in *Hickel* that limited the sweep of *Krushnic* and *Virginia–Colorado,* the Court validated the ability of the government, as the "beneficiary of all claims invalid for lack of assessment work," *sua sponte* to challenge pre-1920 oil shale claims. The Court referred to the legislative history of the Mining Law of 1872 and emphasized that "[w]hile the objective of the 1872 Act was to open the lands 'to a beneficial use by some other party,' once the original claim-

ant defaulted, the defeasance inevitably accrued to the United States, owner of the fee." *Id.* at 55, 91 S.Ct. 196. The Court declared that "we are of the view that § 37 of the 1920 Act makes the United States the beneficiary of all claims invalid for lack of assessment work or otherwise." *Id.* at 57, 91 S.Ct. 196. We hold that this is precisely the legal consequence of the long term inactivity on the four claims at issue before us.

### A.

■ On the basis of *Hickel's* teachings, we conclude that the 46 years of inaction on Appellee's claims reflects "token assessment work, or assessment work that does not substantially satisfy the requirements of 30 U.S.C. § 28 . . . ." *Id.* at 57, 91 S.Ct. 196. Therefore, in this case, "the 1920 Act makes the United States the beneficiary of all claims invalid for lack of assessment work or otherwise." *Id.* The court erred in granting summary judgment in favor of Appellee and should properly have entered judgment in favor of the Secretary of the Interior.

In so concluding, we perforce reject Appellee's suggestion that its assessment work, which took place from 1977 through 1992, offsets the previous 46 years of dereliction and restores a legitimate right to the claims by constituting more than "token assessment work." The short answer to this is that by appropriate analogy, this argument was rejected by the Court in *Hickel* when it noted that a decades-long lapse on assessment work "might be the equivalent of abandonment. . . ." *Id.* at 57, 91 S.Ct. 196. Applying the rationale of the Court, we hold that prior to 1977 Appellee's "default in doing the assessment work . . . ma[de] the United States the beneficiary of all claims invalid for lack of assessment work" long before it resumed assessment work in 1977. *Id.* at 57, 91 S.Ct. 196. Appellee's activity that began in 1977 was too little, too late.

### B.

This, too, must be said. Amendments to the Mining Law, together with subsequent congressional enactments, further confirm that the district court's decision is in conflict with Congress' intent in the Leasing Act to require claimants to perform annual assessment work in order to preserve the validity of their pre 1920 oil shale claims. To be sure, the Court has cautioned that "arguments predicated upon subsequent congressional actions must be weighed with extreme care." *Andrus*, 446 U.S. at 666 n. 8, 100 S.Ct. 1932. However, it also teaches (in construing another facet of the 1920 Act) that subsequent congressional actions should not be "rejected out of hand as a source that a court may consider in the search for legislative intent." *Id.*

The Federal Land Policy and Management Act ("FLPMA"), enacted in 1976, requires claim holders to file an annual affidavit detailing the assessment work performed on the claim. The statute makes the failure to file an affidavit of assessment work a *per se* abandonment of the claim:

> The failure to file such instruments as required by subsections (a) and (b) of this section shall be deemed conclusively to constitute an abandonment of the mining claim or mill or tunnel site by the owner; but it shall not be considered a failure to file if the instrument is defective or not timely filed for record under other Federal laws permitting filing or recording thereof, or if the instrument is filed for record by or on behalf of some but not all of the owners of the mining claim or mill or tunnel site.

43 U.S.C. § 1744(c).

Similarly, the Energy Policy Act of 1992, which revised and clarified the requirements for patenting oil shale claims, confirms the Court's holding in *Hickel*. The Act provides that "[t]he holder of a valid

oil shale mining claim who has filed a patent application and received first half final certificate for patent by October 24, 1992, may obtain a patent pursuant to the general mining laws of the United States." 30 U.S.C. § 242(b). The Act further provides that for claims which had not received the final certificate, "the claim holder shall *no longer be required* to perform annual labor, and instead shall pay to the Secretary $550 per claim per year...." 30 U.S.C. § 242(e)(2) (emphasis added). The language "shall no longer be required" evidences Congress' understanding that prior to the statute's enactment, a claim holder was required to perform annual labor in order to maintain his claim.

\* \* \* \* \* \*

For the foregoing reasons, we hold that Appellee was not entitled to the claims under the savings clause of the Mineral Leasing Act of 1920. Accordingly, the judgment of the district court is reversed.