**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 15, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

REX MONAHAN,

        Plaintiff - Appellant,

v.

UNITED STATES DEPARTMENT
OF INTERIOR,

        Defendant - Appellee.

No. 05-8068

D. Wyo.

(D.C. No. 04-CV-205-ABJ)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **O'BRIEN**, Circuit Judges and **SILER**, Senior Circuit Judge[1].

Rex Monahan appeals from the district court's affirmance of a decision of

the Interior Board of Land Appeals ("IBLA"). Exercising jurisdiction pursuant to

28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

Monahan holds a record title interest in eight federal leases in Campbell

---

[*]This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[1]Honorable Eugene E. Siler, Jr., Senior Circuit Judge, United States Court
of Appeals for the Sixth Circuit, sitting by designation.

County, Wyoming, which contain approximately 40 oil and gas wells.[2] Monahan

did not obtain his leasehold interests directly from the government, but acquired

them through various assignments, beginning in 1979. Monahan operated the

wells on the leased land until August 1996, when he transferred the operating

rights from the surface to the base of the Muddy formation to Emerald

Restoration and Production Company ("Emerald"). Monahan accomplished these

transfers by executing an "Assignment, Bill of Sale and Conveyance" and, as to

each lease, a "Transfer of Operating Rights (Sublease) in a Lease for Oil and Gas

or Geothermal Resources." (R. App. 252-67, 281-85). Monahan reserved an

overriding royalty interest and rights to the undeveloped geological strata below

the base of the Muddy formation.[3] The Bureau of Land Management ("BLM")

approved the transfer of operating rights from Monahan to Emerald on April 1,

1998. The BLM initially required Emerald to post a $25,000 bond, and later

required outside investors to post an additional $50,000 bond.

On March 1, 2000, Emerald filed for bankruptcy under Chapter 11 of the

_____

[2] Monahan's percentage interest in the leases at issue is: WYW0321213
(25%), WYW0320581 (100%), WYW8055 (100%), WYW0319987A (100%),
WYW043928 (50%), WYW043924 (50%), WYW043925 (50%), and
WYW0322854 (100%).

[3] Notably, Monahan *did not* transfer his record title interest in the leases to
Emerald. At oral argument, counsel for the Department of Interior advised that
the Bureau of Land Management does not permit the transfer of record title as to
a particular horizontal layer, but only as to a vertical column. Thus, it would not
have been possible for Monahan to transfer record title and also retain rights in
strata below the Muddy formation.

United States Bankruptcy Code.  The case was converted to a Chapter 7 proceeding and ultimately dismissed.  Emerald's corporate charter has since been revoked by the State of Nevada, and Emerald is not allowed to operate in the State of Wyoming.

On September 5, 2000, the Field Manager of the BLM's Buffalo Field Office ("BFO") issued a memorandum to the Director of the BLM for the State of Wyoming ("the State Director"), recommending additional bonding be sought from the record title holders of all leased lands operated by Emerald because Emerald had filed for bankruptcy and because the wells on those lands were non-producing.  In February 2001, the BLM sent a letter to the record title holders of the leases at issue, including Monahan, demanding additional bonding, and attaching by way of explanation the September 5, 2000 memorandum.  The BLM demanded a bond from Monahan totaling more than $1.2 million.  Monahan denied responsibility and declined to post a bond in any amount.

In August 2001, the BFO sent another letter to Monahan informing him the wells on his leased property were "in a non producing status" with "several significant environmental concerns, i.e., leaking storage tanks, chemical drums, and abandoned electrical transformers."  (R. App. at 69).  The BFO explained it had attempted to work with Emerald to restore several properties to production, but its efforts had been "largely unsuccessful."  (*Id.*)  The BFO estimated plugging and surface restoration liability for all wells operated by Emerald would

-3-

exceed $1.5 million, while anticipated proceeds from Emerald's federal bonds would not exceed $75,000. Accordingly, the BFO ordered Monahan to nominate a valid operator, evaluate the surface restoration needs of the leased lands, and submit plans for production or abandonment.

Through counsel, Monahan requested informal review of the BFO's August 2001 orders. Monahan denied liability because he did not own the operating rights on the leased land. On March 11, 2002, after meeting with Monahan and other record title holders, the BFO issued a decision requiring Monahan to submit plans for either returning the wells to production or plugging and abandoning them and cleaning up any residual surface pollution. Monahan appealed the BFO's decision to the State Director, arguing he had no responsibility for the wells because he had transferred the operating rights to Emerald. The State Director affirmed the BFO on the ground that Monahan, as record title holder, had a continuing responsibility to the lessor (the United States) to fulfill obligations incident to the leases. Monahan appealed to the IBLA. The IBLA consolidated Monahan's appeal with two similar appeals and, on April 22, 2004, affirmed the State Director, ruling Monahan's transfer of operating rights to Emerald did not relieve him of his lease obligations. Monahan appealed to the district court, which affirmed the IBLA.

## II. DISCUSSION

### A. Standard of Review

We accord no particular deference to the district court's decision, and conduct an independent review of the IBLA decision. *Exxon Mobil Corp. v. Norton*, 346 F.3d 1244, 1248 (10th Cir. 2003); *Hoyl v. Babbitt*, 129 F.3d 1377, 1382 (10th Cir. 1997). We will set aside a decision of the IBLA "only if it is arbitrary, capricious, otherwise not in accordance with the law, or not supported by substantial evidence." *Pennaco Energy, Inc. v. U.S. Dep't. of Interior*, 377 F.3d 1147, 1156 (10th Cir. 2004) (quotations omitted).

When reviewing an agency's interpretation of a statute it administers, we first determine whether Congress has directly spoken to the precise issue. *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984); *Cliffs Synfuel Corp. v. Norton*, 291 F.3d 1250, 1257 (10th Cir. 2002). "If the intent of Congress is clear, that is the end of the matter; for the court . . . must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43. However, if the statute is silent or ambiguous on the issue in question, we do not simply impose our own construction on the statute; rather, we ascertain whether the agency's interpretation is a permissible construction of the statute. *Id.* at 843. If it is, we defer to that interpretation. *Id.* at 844.

### B. Arguments on Appeal

On appeal, Monahan makes the same arguments he made to the BFO, the

-5-

State Director, the IBLA and the district court. First, he contends that under the Mineral Leasing Act of 1920, 30 U.S.C. §§ 181-287 ("the Mineral Leasing Act" or "the Act") and the applicable regulations, he has no liability to the government regarding the wells at issue because he conveyed the operating rights to these wells to Emerald, and such conveyance was approved by the BLM. Second, he argues because he no longer owns the operating rights, he cannot assume dominion or control over the wells and would face potential liability to Emerald for trespass if he took any action in relation to the wells. Finally, Monahan argues he should not suffer the consequences of the BLM's failure to require a sufficient bond from Emerald.[4]

The Department of the Interior contends the IBLA's decision is based on a reasonable interpretation of the Mineral Leasing Act and the applicable regulations. It argues Monahan's transfer of operating rights to Emerald was a sublease, not an assignment, and did not relieve Monahan, as the record title holder, from obligations owed to the government under the terms of the leases. As for Monahan's trespass argument, the Department questions its genuineness, in light of the fact that he previously offered to investigate the viability of enhanced oil recovery projects on the lease sites. The Department also points out Emerald

---

[4] We do not address Monahan's argument that Emerald is solely responsible for the operation of the wells under the relevant Unit Agreements because it is undisputed that the Units were terminated automatically for lack of production in 2001.

is defunct and would not be able to maintain a legal action for trespass. As for the sufficiency of bonding, it argues this claim is without merit, as the BLM requested the appropriate amount of bonding from Emerald.

Scott and JoDean Crockett filed an amicus brief urging affirmance of the district court. The Crocketts own a 15,000 acre cattle ranch, which includes at least eleven wells on land leased by Monahan. The Crocketts argue their land has been damaged and is in a dangerous condition because these wells have not been plugged and abandoned or reclaimed.

C.    Analysis

1.    *Liability of Record Title Holders*

Based on its examination of the Mineral Leasing Act and the implementing regulations, the IBLA held that record title holders of federal oil and gas leases bear ultimate responsibility for adherence to lease terms, including the requirements relating to well operations and abandonment, regardless of whether they have transferred operating rights to another entity. While Congress has not spoken to this precise issue, the BLM's interpretation of the relevant statutes is permissible.

The Mineral Leasing Act authorizes the Secretary of the Interior to lease public lands to qualified individuals for oil and gas exploration and extraction. 30 U.S.C. §§ 181, 226. The Act allows a lessee to relinquish his lease or, with the approval of the Secretary, assign or sublease all or a portion thereof. *Id.* §§

-7-

187, 187a, 187b.  Under § 187b, "a lessee may at any time make and file in the appropriate land office a written relinquishment of all rights under any oil or gas lease . . . ."  Upon filing a written relinquishment, "the lessee shall be released of all obligations thereafter accruing under said lease with respect to the lands relinquished . . . ."  *Id*. § 187b.

Under § 187a, "any oil or gas lease . . . may be assigned or subleased, as to all or part of the acreage included therein, subject to final approval by the Secretary . . . ."  Until such approval is given, "the assignor or sublessor and his surety shall continue to be responsible for the performance of any and all obligations as if no assignment or sublease had been executed."  *Id*. § 187a. "Upon approval of any assignment or sublease, the assignee or sublessee shall be bound by the terms of the lease to the same extent as if such assignee or sublessee were the original lessee, any conditions in the assignment or sublease to the contrary notwithstanding."  *Id*.  The Act specifically addresses partial assignments, but not partial subleases: "Any partial assignment of any lease shall segregate the assigned and retained portions thereof, and as above provided, release and discharge the assignor from all obligations thereafter accruing with respect to the assigned lands."  *Id*.

Had Monahan satisfied his lease obligations and made a written relinquishment of his lease, he would have been "released of all obligations thereafter accruing."  *See id*. § 187b.  But Monahan did not relinquish his lease.

-8-

Instead, he subleased a portion of his lease (the operating rights from the surface to the Muddy formation) to Emerald. Section 187a distinguishes assignments from subleases, though neither term is defined in the Act. Under this section, an assignor/sublessor is responsible for the performance of all lease obligations until the assignment/sublease is approved. Upon approval, the assignee/sublessee becomes responsible for the performance of lease obligations. It is not clear whether this releases the assignor/sublessor, or whether the assignee/sublessee becomes jointly liable with the assignor/sublessor. Because the language of the statute is ambiguous, we look to the agency's interpretation of the Act and consider whether that interpretation is permissible.

The Act specifically authorizes the Secretary of the Interior to "prescribe necessary and proper rules and regulations and to do any and all things necessary to carry out and accomplish the purposes of this chapter . . . ." *Id.* § 189. Under these regulations, a person who acquires record title to a lease assumes responsibility for plugging and abandoning non-producing wells, reclaiming the lease site, and remedying existing environmental problems. *See* 43 C.F.R. § 3106.7-6(a) (2001) ("If you acquire record title interest in a Federal lease, you agree to comply with the terms of the original lease during your lease tenure. You assume the responsibility to plug and abandon all wells which are no longer capable of producing, reclaim the lease site, and remedy all environmental problems in existence and that a purchaser exercising reasonable diligence should

have known at the time."). Thus, Monahan assumed responsibility for plugging and abandoning when he acquired record title to the leases; he remains liable unless his transfer of operating rights to Emerald relieved him of such liability.

The regulations classify Monahan's transfer of operating rights as a sublease, not an assignment. An "assignment" is defined as "a transfer of all or a portion of the lessee's record title interest in a lease." *Id.* § 3100.0-5(e). A "sublease" is defined as "a transfer of a non-record title interest in a lease, i.e., a transfer of operating rights is normally a sublease and a sublease also is a subsidiary arrangement between the lessee (sublessor) and the sublessee." *Id.* A sublease "does not . . . affect the relationship imposed by a lease between the lessee(s) and the United States." *Id.* Thus, whatever obligations Monahan assumed upon acquiring record title are not affected by way of the sublease to Emerald. In other words, the sublease did not release Monahan of his lease obligations vis-a-vis the government.

This conclusion is bolstered by § 3106.7-2. Under this section, a lessee[5] can transfer[6] his lease, but has a continuing obligation to the lessor (the government) even upon approval of the transfer:

---

[5] A "lessee" is defined as "a person or entity holding record title in a lease issued by the United States." 43 C.F.R. § 3100.0-5(I). "Record title" is defined as "a lessee's interest in a lease which includes the obligation to pay rent, and the rights to assign and relinquish the lease." *Id.* § 3100.0-5(c).

[6] A "transfer" is defined as "any conveyance of an interest in a lease by assignment, sublease or otherwise." *Id.* § 3100.0-5(e).

-10-

**If I transfer my lease, what is my continuing obligation?**

(a)  You are responsible for performing all obligations under the lease until the date BLM approves an assignment of your record title interest or transfer of your operating rights.

(b)  After BLM approves the assignment or transfer, you will continue to be responsible for lease obligations that accrued before the approval date, whether or not they were identified at the time of the assignment or transfer. This includes paying compensatory royalties for drainage. It also includes responsibility for plugging wells and abandoning facilities you drilled, installed, or used before the effective date of the assignment or transfer.

*Id.* § 3106.7-2. Under the plain meaning of this regulation, even after Monahan transferred the operating rights to Emerald, he remained responsible for plugging wells and abandoning facilities he used prior to the date of the transfer.

To avoid this result, Monahan attempts to rely on the pre-2001 version of 43 C.F.R. § 3106.7-2 (1988). Prior to being amended in 2001, § 3106.7-2 stated:

The transferor and its surety shall continue to be responsible for the performance of all obligations under the lease until a transfer of record title or of operating rights (sublease) is approved by the authorized officer . . . . After approval of the transfer of record title, the transferee and its surety shall be responsible for the performance of all lease obligations, notwithstanding any terms in the transfer to the contrary. When a transfer of operating rights (sublease) is approved, the sublessee is responsible for all obligations under the lease rights transferred to the sublessee.

Monahan claims we should look to this version, rather than the 2001 version,

because this is the version that was in effect at the time Monahan transferred the operating rights to Emerald. This argument must be rejected, as Monahan's lease with the government specifically provides that it is "pursuant and subject to the terms and provisions of the [Mineral Leasing Act] and to all reasonable regulations of the Secretary of the Interior *now or hereafter in force . . . .*" (R. App. at 112 (emphasis added).)

The effect of the "now or hereafter in force" language is to subject lessees like Monahan to changes in regulations. *See Ariz. Silica Sand Co.*, 148 IBLA 236, 238 (1999) ("[The Department of the Interior] has long held that the intent of the language 'now or hereafter in force' is to incorporate future regulations into existing permit terms when they become effective, even though such future regulations may place additional obligations or burdens on a permittee."); *ASARCO Inc.*, 141 IBLA 269, 273 (1997) (same); *Coastal Oil & Gas Corp.*, 108 IBLA 62, 66 (1989) (same); *see also* 66 Fed. Reg. 1883, 1884 (Jan. 10, 2001) ("all Federal and Indian oil and gas leases are subject to future regulations except to the extent such regulations are inconsistent with express lease provisions or the rights granted in the lease.").

Monahan provides no authority for his argument that the "now or hereafter in force" language applies only to clarifying amendments, not amendments affecting liability. Even if he were correct, he would still be subject to the 2001 amendment because this was a clarifying amendment; it did not create a new

category of liability.  The legislative history to the 2001 amendment provides:

> [T]he final rule clarifies the current regulations concerning the responsibilities of assignors and assignees of record title or operating rights interests.  The current version of 43 CFR 3106.7-2 expressly states that an assignor is fully responsible after the assignment and prior to BLM approval of the assignment, but the current rule is not clear as to the responsibility of the assignor after approval.  The final rule makes clear that the assignor continues to be responsible for satisfying those obligations that accrued prior to the approval of the assignment.

66 Fed. Reg. 1883, 1883 (Jan. 10, 2001).[7]  Decisions from the IBLA applying the 1988 rule make clear that under that rule, like the 2001 rule, the record title holder is ultimately responsible for lease obligations.  *See Cross Creek Corp.*, 131 IBLA 32, 36-37 (1994) (the assignment of record title, unlike the assignment of operating rights, gives rise to a contractual relationship between the lessor (government) and lessee's assignee; the lessee is ultimately responsible for plugging and abandoning wells even if it has not performed operations on them); *Ralph G. Abbott*, 115 IBLA 343, 346 (1990) ("The assignee of a federal oil and gas lease, upon approval of an assignment to him, becomes the lessee of the Government and is responsible for compliance with the lease terms;" however, while an operator is primarily responsible for plugging or producing, ultimate responsibility remains with the record title owner of the lease).

    2.    *Trespass*

---

[7] We agree that the 1988 version was ambiguous as to the responsibility of the transferor.  It spoke primarily to the obligations of the transferee.

We similarly reject Monahan's argument that he cannot comply with the BLM's orders because doing so would subject him to liability for trespass. As the district court noted, the BLM is not directing him to enter onto the land operated by Emerald, but rather, to submit plans for either returning the wells to production or plugging and abandoning them. Even if Monahan were required to enter onto the land, he would still not be subject to trespass liability, because Emerald cannot maintain an action for trespass. Emerald's corporate charter was revoked on May 1, 2002. Under Nevada law, it cannot now maintain an action for trespass. *See* Nev. Rev. Stat. § 78.585 (a dissolved corporation continues as a corporate body for two years post-dissolution to defend and prosecute suits and discharge its obligations); *see also* Wyo. Stat. § 17-16-1502(a) (2007) ("A foreign corporation transacting business in this state without a certificate of authority may not maintain a proceeding in any court in this state until it obtains a certificate of authority.").[8]

3.    *Adequacy of Bonding*

Monahan's final argument is similarly unavailing. The BLM regulations specify "a lessee, owner of operating rights (sublessee), or operator" may furnish a lease bond of not less than $10,000 for each lease, a statewide bond of $25,000

---

[8] Moreover, Monahan's sublease to Emerald could have provided Monahan with the right to enter the land to ensure Emerald was complying with all lease obligations. Monahan's failure to protect himself from trespass liability does not extinguish his liability to the government.

covering all leases and operations in any one state, or a nationwide bond of $150,000 covering all leases and operations nationwide. 43 C.F.R. §§ 3104.2, 3104.3 (1988). In this case, Emerald posted a statewide bond of $25,000, with outside investors contributing another $50,000. Although this amount proved to be insufficient to cover the cost of plugging and abandonment, it was not improper. As the IBLA explained, the BLM's policy is not to closely scrutinize the financial state of transferees of operating rights (as opposed to transferees of record title) because the original lessee remains liable upon the default of the operator.

**AFFIRMED.**

ENTERED FOR THE COURT

Terrence L. O'Brien
Circuit Judge