**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 21, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

HIGH COUNTRY CITIZENS
ALLIANCE; TOWN OF CRESTED
BUTTE, COLORADO; BOARD OF
COUNTY COMMISSIONERS OF
THE COUNTY OF GUNNISON,
COLORADO,

    Plaintiffs - Appellants,

v.

KATHLEEN CLARKE, in her official
capacity as Director of the U.S.
Bureau of Land Management; RON
WENKER, in his official capacity as
Colorado BLM Director; UNITED
STATES BUREAU OF LAND
MANAGEMENT; GALE NORTON,
in her official capacity as Secretary of
the Interior; UNITED STATES
DEPARTMENT OF THE INTERIOR;
PHELPS DODGE CORPORATION;
MT. EMMONS MINING COMPANY,

    Defendants - Appellees.

No. 05-1085

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 04-MK-749 PAC)**

---

Roger Flynn (and Jeffrey C. Parsons, Western Mining Action Project, Lyons,
Colorado, for Plaintiffs-Appellants High Country Citizens' Alliance and the Town
of Crested Butte, Laura Magner, Crested Butte, Colorado, for Plaintiff-Appellant

Town of Crested Butte, and David Baumgarten and Thomas A. Dill, County Attorney's Office, Gunnison, Colorado, for Plaintiff - Appellant Board of County Commissioners of the County of Gunnison, on the briefs).

Aaron P. Avila (and Todd S. Aagaard, U.S. Department of Justice, Environment and Natural Resources Div., Kelly A Johnson, Acting Assistant Attorney General, William J. Leone, United States Attorney, Roxane J. Perruso, Assistant United States Attorney, and Karen Hawbecker and Kendra Nitta, Office of the Solicitor, Division of Mineral Resources, Department of the Interior, on the brief), Washington, D.C., for the Federal Defendants - Appellees.

David S. Steefel (and Frank Erisman, on the brief), Holme, Roberts & Owen, L.L.P., Denver, Colorado, for Defendants - Appellees Phelps Dodge Corporation and Mount Emmons Mining Company.

---

Before **KELLY**, **BRISCOE**, Circuit Judges and **JOHNSON,**[*] District Judge.

---

**KELLY**, Circuit Judge.

---

High Country Citizens' Alliance, Town of Crested Butte, Colorado and the Board of Commissioners of the County of Gunnison, Colorado (collectively, Plaintiffs) appeal from the district court's dismissal, for lack of subject matter jurisdiction, of two claims of their three-claim complaint. Plaintiffs' complaint arises out the issuance of a mining patent and names two groups of defendants– federal defendants including the Bureau of Land Management (BLM), Kathleen Clark in her official capacity as BLM Director, Ron Wenker in his official

[*]The Honorable William P. Johnson, District Judge, United States District Court for the District of New Mexico, sitting by designation.

- 2 -

capacity of the Colorado Bureau of Land Management Director, the United States Department of the Interior (collectively, BLM); and private defendants including Mount Emmons Mining Company (MEMCO) and Phelps Dodge Corporation[1] (collectively, MEMCO). The district court entered final judgment pursuant to Fed. R. Civ. P. 54(b) on the two claims involved in this appeal. Aplt. App. 56. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

Background

In December 1992, MEMCO filed a mineral patent application with the BLM, pursuant to the General Mining Law of 1872, 30 U.S.C. §§ 21-47, ("1872 Mining Law"). MEMCO sought a patent on approximately 174 acres of public land in the Gunnison National Forest. 30 U.S.C. § 29. MEMCO asserted in its application that these mining claims, located in 1977 (and amended in 1978), contained valuable deposits of molybdenum.

Plaintiffs filed three separate administrative protests with the BLM, objecting to the grant of MEMCO's application. They argued that the mining claims MEMCO seeks to patent do not contain the required "discovery of a valuable mineral deposit" within each claim, and that the issuance of a patent for the acreage of the claims exceeds that allowed by the 1872 Mining Law. None of the Plaintiffs, now or ever, claim a competing property interest in any of the land.

---

[1] Phelps Dodge is the ultimate parent company of MEMCO.

The BLM determined that nine of MEMCO's claims satisfied patent requirements. On April 2, 2004, the BLM simultaneously dismissed the Plaintiffs' protests in a twelve-page decision, Aplt. Appx. at 61-72, and granted MEMCO a patent for nine of its claims, covering approximately 155 acres. The Plaintiffs filed suit against the BLM and MEMCO twelve days later, seeking declaratory and injunctive relief. In their complaint, the Plaintiffs asserted three claims: (1) the BLM violated the 1872 Mining Law and the Administrative Procedures Act, 5 U.S.C. §§ 701-706 ("APA") by granting MEMCO the patent, (2) the BLM violated the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, by withholding certain documents from Plaintiffs, and (3) the BLM violated the Federal Land Policy and Management Act ("FLMPA"), 43 U.S.C. §§ 1701-1784, and the APA by depriving Plaintiffs an opportunity to review the patent application and failing to provide prompt notice of the denial of the protests and a statement of reasons for the denial.

Plaintiffs filed a motion for preliminary injunction on May 7, 2004, seeking to restore title in the patented lands to the United States. MEMCO filed a motion to dismiss all claims pursuant to Fed. R. Civ. P. 12(b)(6). The BLM filed a similar motion to dismiss with regards to the Plaintiffs' first and third claims pursuant to Fed. R. Civ. P. 12(b)(1), and answered the second claim.

On January 12, 2005, the district court granted BLM and MEMCO's motions to dismiss for lack of subject matter jurisdiction and denied the

Plaintiffs' motion for a preliminary injunction as moot. Aplt. App. 39-55, 56.
The district court then entered judgment on the first and third claims in favor of
the various defendants pursuant to Fed. R. Civ. P. 54(b). The district court held
that third parties who claim no ownership interest in the land subject to a mineral
patent cannot challenge the issuance or validity of the patent under the 1872
Mining Law and have no right to relief under the APA. Id. at 43. On appeal, the
Plaintiffs challenge that conclusion.[2] Specifically, the Plaintiffs argue that the
district court erred by (1) ignoring the presumption of reviewability of agency
actions under the APA, (2) holding that aggrieved persons cannot seek judicial
review of BLM patenting decisions, (3) dismissing Plaintiffs' substantive APA
claim, and (4) dismissing the private defendants from the case. The question of
whether the APA waives sovereign immunity for Plaintiffs, who claim no adverse
interest in the land, to bring a suit challenging the issuance of a patent under the
1872 Mining Law, is a matter of first impression.


Discussion

A.    Standard of Review

Because the district court dismissed the Plaintiffs' action for want of

---

[2] The Plaintiffs do not challenge the dismissal of their claims under the
FLMPA, and challenge the dismissal of their third claim only to the extent it
alleges APA violations. They also do not challenge the dismissal of their FOIA
claims against MEMCO. The Plaintiffs' second claim (FOIA) against the BLM is
still pending in the district court and is not the subject of this appeal.

subject matter jurisdiction, we review the district court's grant of the motions to dismiss de novo. Georgacarakos v. United States, 420 F.3d 1185, 1186 (10th Cir. 2005); Davis ex rel. Davis v. United States, 343 F.3d 1282, 1294 (10th Cir. 2003) (grant of motion to dismiss under either Fed. R. Civ. P. 12(b)(1) or 12(b)(6) is reviewed de novo). We assume the truth of all facts Plaintiffs allege. Georgacarakos, 420 F.3d at 1186.

B.     Subject Matter Jurisdiction-Federal Appellees

It is well settled that the Plaintiffs can only sue the BLM to the extent it waived its sovereign immunity. E.g. United States v. Sherwood, 312 U.S. 584, 586 (1941). While 28 U.S.C. § 1331 grants the court jurisdiction over all "civil actions arising under the Constitution, laws or treaties of the United States," it does not independently waive the Government's sovereign immunity; § 1331 will only confer subject matter jurisdiction where some other statute provides such a waiver. City of Albuquerque v. United States Dep't. of the Interior, 379 F.3d 901, 906-07 (10th Cir. 2004). Waiver of sovereign immunity must be explicit and cannot be implied. Villescas v. Abraham, 311 F.3d 1254, 1256-57 (10th Cir. 2002).

The APA serves as a limited waiver of sovereign immunity, not a grant of subject matter jurisdiction. Califano v. Sanders, 430 U.S. 99, 105-07 (1977); City of Albuquerque, 379 F.3d at 907; New Mexico v. Regan, 745 F.2d 1318, 1321 (10th Cir. 1984). It provides: "A person suffering a legal wrong because of

- 6 -

agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The APA withdraws that waiver of sovereign immunity, however, when the relevant statute, in this case the 1872 Mining Law, "precludes judicial review." 5 U.S.C. § 701(a)(1).[3] In other words, before the waiver of sovereign immunity under § 702 of the APA applies, "a party must first clear the hurdle of § 701(a)." Heckler v. Chaney, 470 U.S. 821, 828 (1985); Beamon v. Brown, 125 F.3d 965, 966 (6th Cir. 1997) ("Under 5 U.S.C. § 701(a)(1), the APA does not waive sovereign immunity when statutes preclude judicial review.").[4]

A presumption of reviewability accompanies agency actions under the APA, but it may be overcome.[5] Block v. Cmty Nutrition Inst., 467 U.S. 340, 349

---

[3] The APA also does not permit review and hence waive sovereign immunity where the "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The parties agree that this exception is not applicable here, and as such, we do not address it.

[4] Unlike the dissent, we view the question of whether the 1872 Mining Law precludes judicial review against a backdrop of sovereign immunity–if the review cannot be had under the APA due to § 701(a)(1) or (2), the government has not waived its sovereign immunity.

[5] The dissent takes the court to task for failing to acknowledge the presumption of judicial review and for holding the government to a lesser standard in demonstrating that judicial review is precluded. As we discuss, Block reaffirmed that the government must counter a presumption in favor of judicial review, but also warned against the use of strong evidentiary formulations (such as clear and convincing) in deciding the legal question of whether congressional intent precluding judicial review is fairly discernible. Block, 467 U.S. at 351. The presumption of judicial review controls where substantial doubt exists about congressional intent on the preclusion issue, but it is hardly conclusive in other

(1984).  In Block, the Supreme Court clarified its earlier "clear and convincing" standard to overcome the presumption of reviewability established in Abbott Labs. v. Gardner, 387 U.S. 136, 141 (1967).  Specifically, the Court found that the clear and convincing standard is "not a rigid evidentiary test but a useful reminder to courts that, where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling."  Block, 467 U.S. at 351.  Two years later, the Supreme Court, relying on Block, reiterated that "Congress ordinarily intends that there be judicial review, and emphasized the clarity with which a contrary intent must be expressed."  Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 671 (1986) (superceded and abrogated on other grounds).  The Tenth Circuit, though characterizing the burden to overcome the presumption as "heavy," Thomas Brooks Chartered v. Burnett, 920 F.2d 634, 641 (10th Cir. 1991), has consistently followed the Block standard.  See Rocky Mountain Radar, Inc. v. F.C.C., 158 F.3d 1118, 1121 (10th Cir. 1998).

To overcome the presumption of reviewability, an intent to preclude judicial review must be "fairly discernible" from the statutory scheme.  Ass'n of

---

circumstances.  Id. ("[W]here substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling.  That presumption does not control in cases . . . [where] the congressional intent to preclude judicial review is 'fairly discernible' in the detail of the legislative scheme.").  Our use of the term "sufficient evidence" in reviewing this issue is done with full appreciation of satisfying the pertinent legal standards.

Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 157 (1970).  The fact that a statute does not explicitly provide for judicial review is not outcome determinative.  Id. at 157.  Rather, the Supreme Court set forth specific factors for courts to consider in analyzing whether, absent explicit language or explicit legislative history, the presumption of reviewability has been overcome:  "The congressional intent necessary to overcome the presumption [of reviewability] may [ ] be inferred from contemporaneous judicial construction barring review and the congressional acquiescence in it . . . or from the collective import of legislative and judicial history behind a particular statute . . . [or] by inferences of intent drawn from the statutory scheme as a whole."  Block, 467 U.S. at 349 (internal citations omitted).

The Plaintiffs maintain the district court ignored the presumption of reviewability.  Aplt. Br. at 12.[6]  We disagree.  The district court cited and applied the Block factors which are pertinent in overcoming such a presumption.  Aplt. Appx. 43-51.  Block discusses the presumption and we are unwilling to assume that the district court missed the predicate and applied the Block factors for no apparent purpose.

_____

[6] We also disagree with the Plaintiffs' characterization of the district court's order as one based on a search for authorization of a private cause of action in the 1872 Mining Law.  Aplt. Br. at 16.  That is too narrow.  A plain reading of the order indicates the district court applied the Block factors to determine if it was fairly discernable from the statute that Congress intended to preclude review.

The 1872 Mining Law provides that "valuable mineral deposits in lands belonging to the United States . . . shall be free and open to exploration and purchase, and the lands in which they are found to occupation and purchase." 30 U.S.C. § 22. Citizens can locate mining claims by discovering valuable mineral deposits on lands open to location. 30 U.S.C. §§ 22, 28. The 1872 Mining Law permits a claim holder to obtain a patent (fee title) to the lands encompassed by the mining claim he or she holds. 30 U.S.C. § 29. The BLM must determine whether a patent application complies with all the statutory requirements. Id. After finding that it has, the BLM's issuance of a patent is ministerial. Marathon Oil Co. v. Lujan, 937 F.2d 498, 501 (10th Cir. 1991).

The 1872 Mining Law provides a mechanism for resolving disputes over claim ownership or satisfaction of the patent requirements. The applicant must give notice to potentially competing claimants and provide the opportunity for competing claimants to file their adverse claims. 30 U.S.C. §§ 29-30. The law expressly creates a right of action for adverse claimants. 30 U.S.C. § 30. It also provides a process for third parties who claim no ownership in the land to file protests with the BLM, and provide evidence as to why the applicant has not satisfied the requirements for a patent. 30 U.S.C. § 29. The Plaintiffs agree they are not adverse claimants.

There is no express grant of judicial review in the 1872 Mining Law to those who protest unsuccessfully. As such, we look to the Block factors to

- 10 -

determine whether there is sufficient evidence of congressional intent to preclude review.

*Import of Legislative and Judicial History*

Although the Plaintiffs are correct that "[c]ongressional intent in enacting the 1872 Mining Law was not for the unfettered development of public land," Aplt. Br. at 23 (emphasis omitted), the legislative history reveals that security of title was integral to and paramount in the passage of the mining laws. After a thorough review of the legislative history, we conclude that judicial review of a grant of a patent by a third party (with no colorable property interest) conflicts with what Congress sought to achieve.

Because the 1872 Mining Law essentially served to combine and fine tune two earlier acts, the Lode Law of 1866 and the Placer Act of 1870, it is necessary to review the history of that legislation as well.[7] In 1864 during the Civil War, Congress began the debate over regulation of mining lands. Allowing a mechanism by which the government could sell the land and generate revenue to ease the war debt was the initial concern and much debate focused on how much, if any, to tax the mines. Cong. Globe, 38th Cong., 1st Session, 2557-2559 (1864). Congress sought not just an immediate solution to the war debt, but an end to the

---

[7] The dissent contends that the legislative history of the Lode Law and Placer Act is "irrelevant." Congress intended that the 1872 Mining Law would incorporate these statutes, Cong. Globe, 42nd Cong., 2d Session, at 532-34 (1872), and thus we find the legislative history of these acts extremely relevant to the analysis.

- 11 -

problem of vagrancy and lack of development plaguing the mining states. The

solution of fixed interests became clear:

> I suppose two thirds of the area of California is what is called mining land. Not an acre of it has been surveyed. It has not been laid off into sections; it has not been laid off into small parcels, so that individuals can acquire rights to it. They go upon it temporarily and perhaps put up cabins; they stay there as long as they can work with some special advantage; but it is only a place for a day, or a month, or a season, and then they wander off to other places; whereas if they could acquire permanent rights they would make their homes there . . . . They have had no opportunity to acquire a right to the lands. The State of California would be twice as strong and twice as populous today if at an early period provision had been made whereby persons seeking rights there could secure permanent and fixed interests.

Id. at 2557. The development of mining was a critical concern. See id. at 2559

("I say it is the first interest of the public . . . to have this wealth developed . . . I

do not vote for any enactment that shall discourage the development of this

wealth.").

Debate between the western senators and the eastern senators grew, as the

eastern senators sought to maximize revenue, while the western senators sought to

maximize development. See Cong. Globe, 38th Cong., 2d Session, at 684-687

(1865); Cong. Globe, 39th Cong., 1st Session, at 301 (1866). The one common

thread was a desire to establish secure and permanent title to the land in the

miners. See Cong. Globe, 38th Cong., 2d Session, at 684-687 (1865). Although

Indiana Senator Julian's bill was eventually killed by the western senators

- 12 -

concerned about his proposed taxation, permanent fee title in the land was a priority, even for the eastern senators. The practice of leasing the land "drew into the mining regions a population of vagrants, gamblers, and ruffians, excluding sober and intelligent citizens, and making the establishment of civil communities impossible." Id. at 685. Senator Julian compared the English system to that of the United States: "the English miner, having the freehold of the soil, husbands and improves his property, and follows the vein downward even to the distance of two thousand feet. The American lessee can only take what he finds near the surface of the ground." Id. He continued: "Where there is no security for land titles, no permanent communities can be established . . . . By denying permanent ownership in the soil, and thus preventing its improvement, it necessarily keeps down its value . . . . Men will not lend their capital to mining projects where the title to the soil is in the Government, and cannot be pledged as security." Id. at 686. Thus among the disagreements between east and west, the importance of permanent title was one area where the senators found common ground.

In 1866, Nevada Senator Stewart introduced a bill that would eventually become the Lode Law of 1866.[8] Its provisions were similar to those of the 1872 Mining Law. Cong. Globe., 39th Cong., 1st Session, at 3225 (1866). Senator

---

[8] A lode is a vein of hard rock minerals, such as gold and copper, contained within surrounding barren rock. A placer claim acquires deposits of minerals at or near the surface, such as gold contained in river gravel. Richard W. Harris, An Introduction to Mining Law, 7 Nev. Law. 15, 15-16 (1999).

Stewart proposed this bill as a mechanism for "the Government to give title, so important for permanent prosperity" whose urgency increased "by the introduction of bills looking to what the miners regard as a general system of confiscation destroying all confidence in mining titles and by the <u>absolute necessity of some system guarantying to capitalists security for their investment</u>." Id. at 3227 (emphasis supplied). Senator Stewart believed that the Lode Law of 1866 would "give stability to mining titles, invite capital, and greatly increase the production of the precious metals." Id. Security of title was a primary purpose of the 1866 Lode Law: "We want a law of the character of the bill under consideration to establish and secure mining titles. While these are in doubt a feeling of insecurity will paralyze all our efforts . . . . Let a just, liberal, and definite policy be adopted toward the miners. Add to their possession the absolute right of property, and you will have lain a solid foundation for large and increasing yields . . . . The feeling of security and independence produced by the right of property in the soil is the real foundation of our stability . . . ." Id. at 3228.

The Placer Act of 1870 applied the provisions of the Lode Law to the patenting of lands with placer deposits. Once again, the senators stressed the importance of acquiring secure title as a prerequisite to making improvements on the land. Cong. Globe, 41st Cong., 2d Session, at 4403-04 (1870).

The Mining Law of 1872 essentially united the previous mining legislation

and remedied problems that had developed with the implementation of those laws.

Cong. Globe, 42nd Cong., 2d Session, at 532-34 (1872).  Senator Sargent

explained:

> We are inducing miners to purchase their claims, so that large amounts of money are thereby brought into the Treasury of the United States, causing the miners to settle themselves permanently, to improve and establish homes, to go down deeper in the earth, to dig further into the hills, and in every way improve their own condition . . . .  This bill simply oils the machinery a little.

Id. at 534.[9]  Congress, in passing the 1872 Mining Law, was in search of a more

definite rule because, in part, "the whole region was in litigation."  Id. at 2459.

Essential to this definitiveness was certainty in one's title by the finality inherent

in the issuance of a patent:

> The object of the patent is to give title; it cuts off all uncertain title; if the person wants to improve a claim he can go and buy it, and it becomes private property, and it is certainly the best policy to have any kind of property improved that it shall become private property.  Men think more of a patented claim than they do of one that is not patented.  They will spend millions in prospecting a patented claim where they will not

---

[9]  The dissent suggests these excerpts of legislative history are "selective" and not in accordance with text and structure of the Mining Law.  We disagree with the dissent's characterization of the history reported here as "selective." According to the dissent, the legislative history is completely opposite of what was enacted–provisions that actually increase litigation rather than decrease it. While an interesting theory, the right of action for adverse claimants the Mining Law provides for, 30 U.S.C. § 30, is consistent with an interest in finality because it narrows and defines the class of people that could bring an action.  The third party protest procedure, 30 U.S.C. § 29, also reflects this concern–such protests are made before the patent issues, enabling the issuance of a patent to be final.  In addition, Block directs us to examine the legislative history in our analysis.

- 15 -

> spend hundreds of dollars to prospect a claim where the title is uncertain and liable to be disturbed by somebody outside.

Id.

This legislative history reflects a clear concern with the finality of the patent as a prerequisite to miners being willing to invest the necessary time and capital to develop the industry.

The Plaintiffs argue that the 1872 Mining Law is not a one-way street towards patenting, but rather an effort to balance the needs of the mining industry with those of non-mining users such as homesteaders, railroads and other interests, presumably the need of the national treasury. Aplt. Br. at 24-25. First, the interests Plaintiffs identified are not necessarily competing interests to the mining industry. A prosperous west as a result of the mining expansion would simultaneously stimulate the national treasury, the interests of homesteaders and the railroads. Second, the Plaintiffs' interests are primarily recreational and environmental, two interests that were not paramount at the time Congress sought to develop the economy through mining.

It is beyond doubt that in 1872 Congress was concerned with finality of title. Permitting a challenge by third parties with no interest in the land would allow the kind of lengthy litigation over rights that a patent was designed to avoid. This would no doubt frustrate the purpose of the 1872 Mining Law, as Congress envisioned it then. We recognize that over the last 133 years, interests,

concerns and priorities have shifted. Many have called for the revision and repeal of this seemingly antiquated law. See e.g. Robert J. Uram, Prospects for Mining Law Reform, 12 Nat. Resources & Env't 191 (1998). But that responsibility for change lies with Congress, not the courts. At its core, the 1872 Mining Law was about ensuring the settled expectations of the emerging mining corporations. See e.g., Meyer & Riley, Public Domain, Private Dominion, Sierra Club Books, 46, 52, 56, 78 (1985) (noting that "[p]roviding the[] powerful interests [of the mining corporations] with security of ownership, protection against popular hostility, and the opportunity to advance their control at the state level were the compelling motivations behind the legislation," and "the 1872 Mining Law creates a presumption in favor of mining that is difficult– if not impossible– to overcome . . . [it] is the Magna Carta of mining on public land; its provisions have a status higher than that of ordinary law"); Carl J. Mayer, The 1872 Mining Law: Historical Origins of the Discovery Rule, 53 U. Chi. L. Rev. 624, 648 (1986) (the impetus for the 1872 Mining Law had everything to do with the mining corporations).

Next we consider judicial construction of the 1872 Mining Law. It is essentially undisputed that the cases, both contemporaneous with the 1872 Mining Law and subsequent to the enactment of the APA, uniformly preclude persons situated similarly to Plaintiffs, that is, not claiming a property interest in the land, from judicially contesting the validity of the patent. Although the APA changed

- 17 -

the landscape of reviewing agency decisions, these cases, while not dispositive,

are nonetheless instructive.  As early as 1881, the Supreme Court held that an

issued patent:

> not merely operates to pass the title, but is in the nature of an
> official declaration by that branch of government to which
> the alienation of the public lands, under the law, is intrusted
> (sic), that all the requirements preliminary to its issue have
> been complied with.  The presumptions thus attending it are
> not open to rebuttal in an action at law.  It is this unassailable
> character which gives to it its chief, indeed its only, value, as
> a means of quieting its possessor in the enjoyment of the
> lands it embraces.  If intruders upon them could compel him,
> in every suit for possession, to establish the validity of the
> action of the Land Department and the correctness of its
> ruling upon matters submitted to it, the patent, instead of
> being a means of peace and security, would subject his rights
> to constant and ruinous litigation.

Smelting Co. v. Kemp, 104 U.S. 636, 640-41 (1881).  Absent a challenge to the

BLM's jurisdiction, a "patent is unassailable for mere errors of judgment."  Id. at

646.  See also Steel v. St. Louis Smelting and Refining Co., 106 U.S. 447, 451

(1882) (the BLM "must consider and pass upon the qualifications of the applicant,

the acts he performed to secure the title, the nature of the land, and whether it is

of the class which is open to sale.  Its judgment upon these matters is that of a

special tribunal and is unassailable except by direct proceedings for its annulment

or limitation" based on lack of jurisdiction).[10]  The courts were also clear that it

_____

[10]  We are not persuaded that Smelting Company and Steel should be
dismissed or disregarded because "they involved the distinction between courts of
law and equity."  The dissent completely ignores the extensive language in both
opinions supporting the idea of finality of patent.  See Smelting Company, 104

- 18 -

"does not lie in the mouth of a stranger to the title to complain of the act of the government with respect to it." Smelting Co., 104 U.S. at 647; see also Iron Silver Mining Co. v. Campbell, 135 U.S. 286, 301 (1890) ("When [a person] has once obtained the patent of the United States for his land, he should be only required to answer persons who have some established claim.") (emphasis added); Sparks v. Pierce, 115 U.S. 408, 413 (1885) ("To entitle a party to relief against a patent of the government, he must show a better right to the land than the patentee, such as in law should have been respected by the officers of the land department, and being respected would have given him the patent. It is not sufficient to show that the patentee ought not to have received the patent. It must affirmatively appear that the claimant was entitled to it, and that, in consequence of erroneous rulings of those officers on the facts existing, it was denied to him."); Wight v. Dubois, 21 F. 693, 694 (C.C.D. Col. 1884) (in a patent issue, "when grantor and grantee are satisfied, a stranger has nothing to say").

The Plaintiffs' arguments that these cases are irrelevant because they involved suits between private parties is not persuasive. At its core, the goal– to invalidate the patent– is the same, and the courts' resolutions of these questions is indicative of an emphasis on finality. Nor does the Plaintiffs' urging that "pre-APA caselaw is inapplicable" persuade us. Block explicitly directs courts to

_____

U.S. at 644-47 (referring to the "conclusiveness of a patent" as a "doctrine"). We think that Block requires us to consider contemporaneous cases.

- 19 -

consider these contemporaneous constructions and the judicial history as a whole, regardless of shifting and evolving interests. In arguing that the general public's interest is paramount, Aplt. Br. 23-24, the Plaintiffs miss the point. While they are correct in their assertion that the Supreme Court has recognized the interest of the public in making sure the patents conform to law, Cameron v. United States, 252 U.S. 450, 460 (1920), the mechanism Congress established is an administrative one (through the BLM), not a judicial one.

In Wight, the court confronted almost the same situation as here. It rejected an attempt by a party claiming no property interest in the land to challenge the issuance of a mining patent in the courts and found that the sole remedy was to file an objection before the Land Department. Wight, 21 F. at 693-94, 696. The court determined that once the Land Department overrules the protest, there is "no further right or remedy." Id. at 696. The Wight court, interpreting the 1872 Mining Law, compared a protestant's situation to that of an amicus curiae and held that where the Land Department has rejected the protest, "the protestant has no further standing to be heard anywhere. The protest cannot be made the basis of any litigation in the court." Id.; see also Beals v. Cone, 188 U.S. 184, 187 (1903) ("There is no suggestion in the pleadings that the protestants were in any way interested in the ground applied for, or that they were acting other than as good citizens, seeking to prevent a wrong upon the government.

Their standing in the proceeding was in the nature of amici curioe [sic].");[11] 2 Am. Law of Mining §§ 53.04, 53.06 ("the protestant cannot, by filing a protest, acquire any right or equity in the land which can be made the basis of a suit . . . to cancel the patent . . . . A protestant who does not allege an interest in himself stands solely in the position of amicus curiae.").

Although we have been unable to find, and the parties have not provided, a case directly on point, analogous situations after the enactment of the APA provide some insight. On balance, when viewed as a whole and in light of the legislative history, the modern judicial history also supports our conclusion.

Several cases have indicated that those in the Plaintiffs' position, who assert no competing interest in the land, have no right of action to challenge the issuance of a patent. Discussing land patents, the Ninth Circuit has emphasized that "a United States patent is protected from easy third-party attack. It is not sufficient for one challenging a patent to show that the patentee should not have received the patent; he must also show that he (the challenger) is entitled to it." Kale v. United States, 489 F.2d 449, 454 (1973) (internal citations omitted); see

_____

[11] Although the dissent correctly notes that Beals presented the question of whether a protester, who was not a party in the prior proceeding, could invoke res judicata, the court's characterization of the protesters as amicus curiae is telling. The fact that the protesters asserted no interest in the land, and were acting as "good citizens" led the court to conclude that they were not parties in interest, and as such, could not invoke res judicata. See Beals, 188 U.S. at 187.

also Leisnoi, Inc. v. United States, 313 F.3d 1181, 1185 (9th Cir. 2002).[12]

Moreover, as recently as 1999, the Ninth Circuit relied on Smelting Co. to define

a patent as "an official declaration of title which is, with limited exceptions,

unassailable and not rebuttable." United States v. Shumway, 199 F.3d 1093, 1096

(9th Cir. 1999).[13]

 In an action between two private parties challenging the validity of a

patent, the Ninth Circuit, relying on St. Louis Smelting, again came down on the

side of finality:

> As a matter of federal law, it is well established that the validity
> of a deed or patent from the federal government may not be
> questioned in a suit brought by a third party against the grantee
> or patentee . . . .  Simply stated, a plaintiff in such a case has no
> cause of action.  These holdings are supported by sound reason.
> When public lands are conveyed to private individuals, a
> contractual relationship is created between the Government and
> the grantee; the integrity of such transactions could be upset if
> a grantee . . . became liable to an amorphous class of third
> persons.

Raypath, Inc. v. City of Anchorage, 544 F.2d 1019, 1021 (9th Cir. 1976) (internal

citations omitted).

---

[12]  The dissent points out what we readily acknowledge: several cases we must consider including Kale, Leisnoi and Raypath are not directly on point because they do not involve the 1872 Mining Law.  These cases did however, involve land patents and land appropriation and are instructive in analyzing the propriety of third-party involvement.

[13]  The Plaintiffs argue that Shumway is irrelevant because the patent discussion is dicta and was not dealing with judicial review under the APA.  Aplt. Br. at 31.  We consider it for what it is worth–in a case of first impression, we survey the body of judicial history available, if only for the sake of completeness.

Although Raypath is not factually identical to the instant action because it involved a suit between private parties, Aplt. Br. at 30, the effect is really the same– here, the Plaintiffs attempt to state a claim against the BLM, but the effect of their victory would be to divest MEMCO of its patent. It cannot be that what one cannot achieve directly, he is permitted to achieve indirectly, especially when that end, divestiture of title, was one of Congress' primary concerns when it passed the 1872 Mining Law.

The Plaintiffs also suggest that the district court overlooked several cases allowing judicial review of patenting decisions under the APA, despite no express provision in the 1872 Mining law allowing judicial review. Aplt. Br. at 35-41 (citing, e.g., Exxon Mobil Corp. v. Norton, 346 F.3d 1244, 1248 (10th Cir. 2003); Cliffs Synfuel Corp. v. Norton, 291 F.3d 1250, 1257 (10th Cir. 2002); Mt. Emmons Mining Co. v. Babbitt, 117 F.3d 1167, 1170 (10th Cir. 1997); see also Adams v. Witmer, 271 F.3d 29, 34 (9th Cir. 1958)). As we discuss below, cases must be read against their facts, and these cases generally involve patent applicants seeking judicial review of the denial of a patent, not strangers to the title seeking judicial review of the grant of a patent to another. Although the Plaintiffs suggest that these situations should merge, the former involve mining claimants asserting property rights, not a potentially unlimited number of third-parties without such rights seeking to invalidate the property rights of others. Given an administrative review process for third-party issues, and the long

judicial construction prior to the APA which did not permit judicial review of such claims, we would be hard pressed to conclude that the APA changed this.[14]

In supplemental briefing, the Plaintiffs argue that this circuit's recent decision in Southern Utah Wilderness Alliance v. BLM, 425 F.3d 735 (10th Cir. 2005) ("SUWA"), resolves the question before this court. There, several environmental organizations brought suit against the BLM to enjoin a county road construction project across BLM land. This court rejected a BLM argument that the BLM had authority to rule on the counties' rights of way. The argument was based on Cameron, 252 U.S. 450, which upheld the BLM's power to determine the validity of unpatented mining claims. In so ruling, this court made the following observation about protests to the issuance of a patent under the 1872 Mining Law:

> Furthermore, when a private party protests the issuance or nonissuance of a patent, the BLM has the authority to hold a hearing and pass on the applicant's compliance with the statutory requirements. This determination is binding on courts, reviewable only in accordance with administrative law or in a direct action to cancel, modify, or issue the patent . . . . Once title passes, however, the BLM loses authority over the subject lands, and the title granted by the patent can be challenged only

---

[14] The dissent urges reliance on South Dakota v. Andrus, 614 F.2d 1190 (8th Cir. 1980), strongly implying that the State (without an ownership interest) was permitted to assert its rights in a challenge to a patent under the 1872 Mining Law. In Andrus, the BLM was the party that brought suit, and South Dakota, which sought to intervene, was permitted to file an amicus brief. Andrus, 614 F.2d at 1192. Moreover, the state's subsequent action seeking an order compelling an environmental impact statement did not implicate the finality of a patent because it dealt with issues prior to the patent's issuance.

through the courts.

Id. at 754 (internal citations omitted).  The Plaintiffs argue that this language establishes the jurisdiction of the courts to hear challenges such as the one in the instant action.  We disagree.  The cases relied on by the panel for this proposition, Smelting Co. and Cameron, do not support any right of review for those with no claimed interest in the patented land, and in fact, argue against such a construction.[15]

As previously noted, most of the cases on which Plaintiffs rely recognize reviewability of claims by those who assert an interest in the land- either litigants whose patent application was denied[16] or those asserting a competing claim (whose right to review the 1872 Mining Act explicitly recognizes in §30).  Aplt. Br. at 35-41; Aplt. Reply at 12-13 & n.3 (citing, e.g., Babbitt, 117 F.3d 1167; Brennan v. Udall, 379 F.2d 803 (10th Cir. 1967); Adams, 271 F.2d 29).  The question is not, as the Plaintiffs frame it, whether the court can review BLM decision making under the APA.  See Aplt. Br. at 36.  The question, rather, is whether third parties claiming no interest in the land can challenge the issuance of a patent.  Allowing review of claims by adverse claimants or those whose patent

[15] One might point out that Smelting and Cameron were decided before the APA, yet necessarily relied upon by the Plaintiffs here.

[16] We discuss these two categories together because both involve property interests in the subject lands.  An unpatented mining claim is a fully recognized possessory interest.  United States v. Locke, 471 U.S. 84, 86 (1985).

the BLM denied, addresses a fundamentally different concern than allowing <u>any and all</u> unrelated third parties to embroil a mineral patent holder in litigation. Plaintiffs acknowledge this distinction, Aplt. Br. at 37, but argue that these cases indicate we are to look to the APA for a cause of action, not to the 1872 Mining Law. That is precisely what we do here; the APA inquiry, however, must turn on whether congressional intent to preclude review is fairly discernable, bringing the action outside the APA's scope; and as such, the inquiries go hand in hand.

*Contemporaneous judicial construction and congressional acquiescence.*

Congress has never revised the 1872 Mining Law to evidence disagreement with the holdings of cases such as <u>Smelting Co.</u>, <u>Steel</u>, and <u>Wight,</u> which held that judicial challenges to patents by third parties were barred. To find that Congress has acquiesced in a court or agency interpretation, the BLM and MEMCO must show by "abundant evidence that Congress both contemplated and authorized" the interpretation at issue. <u>Catron County Bd. of Comm'rs, NM v. United States Fish and Wildlife</u>, 75 F.3d 1429, 1438 (10th Cir. 1996) (quoting <u>Commodity Futures Trading Comm'n v. Schor</u>, 478 U.S. 833, 847 (1986)).

Congress has enacted multiple changes to the Mining Law. <u>See</u> <u>e.g.</u>, The Multiple Use Mining Act of 1955, 30 U.S.C. §§ 601-603, 611-615 (withdrawing materials like sand, gravel, stone and clay from the purview of the Mining Law); Multiple Mineral Development Act of 1954, 30 U.S.C. §§ 521 *et seq.* (allowing mining claims and mineral leases to exist on the same land and resolve conflicts

when development occurred under both the 1872 Mining Law and the Mineral Leasing Act of 1920); The Mineral Leasing Act of 1920, 30 U.S.C. §§ 181 *et. seq.* (establishing leasing program for oil, gas, sodium, phosphate, oil shale and potash); Act of February 12, 1903, 32 Stat. 825 (providing for assessments on oil mining claims); Act of January 31, 1901, 31 Stat. 745 (extending mining laws to saline lands); Act of June 6, 1900, 31 Stat. 321 (extending mining laws to Alaska); Act of February 11, 1897, 29 Stat. 526 (extending placer mining laws to lands containing petroleum).

Despite these many revisions, Congress has not chosen to amend the 1872 Mining Law to provide Plaintiffs with a right of action. Whether Congress has acquiesced in the judicial interpretations of <u>Smelting Co.</u>, <u>Steel</u>, and their progeny is a difficult and close question. <u>See</u> <u>Catron</u>, 75 F.3d at 1438; <u>Cent. Bank of Denver v. First Interstate Bank of Denver</u>, 511 U.S. 164 (1994). Congressional silence alone is not enough to prove acquiescence. <u>See e.g.</u>, <u>Brown v. Gardner</u>, 513 U.S. 115, 121 (1994); <u>Schor</u>, 478 U.S. at 846; <u>Girouard v. United States</u>, 328 U.S. 61, 69 (1946); <u>Catron</u>, 75 F.3d at 1438. Silence as to one area, however, coupled with a myriad of revisions within the same statutory scheme begins to look like acquiescence. <u>See</u> <u>Johnson v. Transp. Agency, Santa Clara County, Cal.</u>, 480 U.S. 616, 629 n.7 (1987) ("Congress has not amended the statute to reject our construction, nor have any such amendments even been proposed, and we therefore may assume that our interpretation was correct."); <u>see also</u>

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763-64 (1998); Ankenbrandt, 504 U.S. 689, 700-01 (1992). Regardless, we find consideration of the other Block factors sufficient to evidence an intent to preclude review.

*Statutory Scheme as a Whole*

The statutory scheme of the 1872 Mining Law is indicative of Congress' intent to preclude review to those with no adverse claim in the patented land. We disagree with the Plaintiffs' apparent argument that the substantive requirements for a patent somehow support a right of action for third parties with no interest in the land. Aplt. Br. 21-23. The substantive requirements have no bearing on what class of people Congress envisioned being able to challenge an issued patent. Moreover, the BLM's determination of the satisfaction of these requirements gives rise to a conclusive presumption of satisfaction, see e.g. Creede & Cripple Creek Mining and Milling Co. v. Uinta Tunnel Mining and Transp. Co., 196 U.S. 337, 353 (1905), a further demonstration of Congress' concern with finality.

Rather, we examine the provisions Congress included to resolve disputes. In 30 U.S.C. § 29, Congress made a limited provision for the role of third parties:

> If no adverse claim shall have been filed with the register of the proper land office at the expiration of the sixty days of publication, it shall be assumed that the applicant is entitled to a patent, upon the payment to the proper officer of $5 per acre, and that no adverse claim exists; and thereafter no objection from third parties to the issuance of a patent shall be heard, except it be shown that the applicant has failed to comply with the terms of sections 21, 22 to 24, 26 to 28, 29, 30, 33 to 48, 50 to 52, 71 to 76 of this title and section 661 of Title 43.

This "objection" has been defined as a protest. 43 C.F.R. § 3872.1; see also Wight, 21 F. at 696. Neither the statute, nor the BLM regulations provide the protestant with rights of appeal. See 30 U.S.C. §§ 29-30; 43 C.F.R. § 3872.1. The 1872 Mining Law also sets forth a detailed procedure that adverse claimants must follow and provided that the adverse claimant timely files his claim, the Mining Law grants the adverse claimant an opportunity to have the claim adjudicated in a court, prior to the BLM's final decision on the patent application. Plaintiffs could not avail themselves of this procedure. Compare 30 U.S.C. § 30 with 2 Am. Law of Mining, § 53.08 ("A protestant who claims no interest in himself which would be affected by the issuance of a patent cannot question the judgment of the manager of the land office . . . in passing upon the application and his protest and is not entitled to appeal such decision.").

Together, Sections 29 and 30 provide a mechanism to settle disputes between the patent applicant and adverse claimants and allow others to bring to the BLM's attention any other reason why the patent should not issue. See Enterprise Mining Co. v. Rico-Aspen Consol. Mining Co., 66 F. 200, 208 (8th Cir. 1895) ("There is no doubt that the object of these provisions of the act of congress is to require the conflicting claims of all parties to be adjusted before the patent issues.").

The Plaintiffs argue that inclusion of third parties in the statutory scheme is inconsistent with the conclusion that Congress intended to preclude review. Aplt.

Reply Br. at 17-18. Congress provided for third party participation in the administrative process, and thus, the Plaintiffs reason, they must be able to avail themselves of judicial review. We disagree. Congress, by providing a right of action for adverse claimants, 28 U.S.C. §§ 29,30, certainly knew how to provide one for unsuccessful protesters. Rather, the ability of protesters to appear and bring information before the BLM reflects a Congressional desire to have all information before the BLM so that, when the BLM renders a decision, and issues a patent, the patent will be final. The limited role that the protesters play in the statutory scheme, coupled with congressional interest in finality and security of title, persuade us that the statutory scheme as a whole suggests an intent to preclude review. We acknowledge that APA jurisdiction is not dependent on an express or implied private right of action in the 1872 Mining Law, but we cannot ignore how that act functions with the perfectly predictable range of disputes that might occur under it,

Despite the presumption of reviewability, it is fairly discernable here, after consideration of all the Block factors,[17] that Congress, when it enacted the 1872

_____

[17] The dissent reasons that the facts of Block (with no provision for consumer involvement in agency proceedings) suggest a contrary result here. The argument is that because Congress provided for third party involvement in the agency review process, third parties must have a right of action in the courts. This correlative does not necessarily follow. Here, the Mining Law expressly provides for a right of action for adverse claimants, and thus had Congress intended to expand the scope of protester involvement beyond the agency stage, it certainly could have done so.

Mining Law, intended to preclude judicial review to third parties claiming no property interest in the patented land and to date has not chosen to change this approach. As such, we find that the Plaintiffs have no federal right of action against the BLM.

C.     <u>5 U.S.C. § 555(e) Claim</u>

The Plaintiffs also bring suit, alleging substantive violations of the APA. Specifically, § 555(e) provides:

> Prompt notice shall be given of the denial in whole or in part of a written application, petition, or other request of an interested person made in connection with an agency proceeding. Except in affirming a prior denial or when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for denial.

5 U.S.C. § 555(e).

Even if the BLM did violate this notice provision, the Plaintiffs have no remedy. The purpose of this provision is to allow a reviewing court to assess the agency's decision. See <u>Friends of the Bow v. Thompson</u>, 124 F.3d 1210, 1214-15 (10th Cir. 1997); <u>see</u> <u>also</u> <u>Thompson v. Dep't of the Treasury</u>, 533 F. Supp. 90, 96 (D. Utah 1981). Here, there is no such right of review available to the Plaintiffs. As such, they failed to identify any prejudice suffered or damage incurred that would entitle them to relief. Moreover, the Plaintiffs cannot challenge the patent under the 1872 Mining Law, and we will not allow them to do so indirectly. We find that the district court properly dismissed this claim.

- 31 -

D.      Subject Matter Jurisdiction- MEMCO

The Plaintiffs acknowledge that the 1872 Mining Law provides no private right of action.  See Aplt. Br. at 32, 48.  Rather, they argue that the private Defendants, MEMCO and Phelps Dodge Corporation, are necessary parties within Fed. R. Civ. P. 19(a) because an order declaring the granting of the patents invalid would destroy or impair their legal entitlements.  Because we find the Plaintiffs have no right of action against the BLM, the district court properly dismissed the private Defendants.

E.      Standing

In light of our jurisdictional ruling, we need not reach the issue of whether the Plaintiffs have standing under Article III.

AFFIRMED.

No. 05-1085, <u>High Country Citizens' Alliance, et al. v. Clarke, et al.</u>

**BRISCOE,** J, dissenting**:**

I respectfully dissent. This is a Rule 12(b)(6) dismissal, which we review <u>de novo</u>. The outcome of this case revolves around whether Congress intended the 1872 Mining Law to preclude judicial review under the APA. The narrow issue presented is whether the agency has overcome the strong presumption favoring judicial review of the agency's action under the APA, where the text of the 1872 Mining Law expressly provides for participation by protesters in the agency proceeding.

I.    *Sovereign immunity is not at issue*

Although the majority and the district court frame the controlling issue as whether the APA waives sovereign immunity for plaintiffs to challenge the issuance of a patent pursuant to the 1872 Mining Law, sovereign immunity is not at issue in this case.

According to the district court, "[t]he two exceptions to the waiver of sovereign immunity under [5 U.S.C.] § 702 are: (1) when a statute specifically precludes judicial review of agency action, or (2) when the subject action is committed to the agency's discretion by law. 5 U.S.C. § 701(a)." Order 01/12/05, at 7. The district court reasons, "[t]hus, if the 1872 Mining Law precludes Plaintiffs' claims against Federal Defendants, then the Federal Defendants are entitled to sovereign immunity." Order 01/12/05, at 7. The majority appears to agree with the district court that this case turns on whether the

plaintiffs' claims are barred by sovereign immunity, mentioning "sovereign immunity" several times and framing the issue as "whether the APA waives sovereign immunity for Plaintiffs." Maj. Op. at 5.[1] Contrary to the district court's and the majority's assertions, sovereign immunity is not at issue.

The district court's and majority's analysis conflicts with the APA. See 5 U.S.C. §§ 701(a), 702. According to 5 U.S.C. § 701(a), "[t]his chapter applies, according to the provisions thereof, except to the extent that -- (1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a). Section 702 waives sovereign immunity "in virtually all actions for non-monetary relief against a U.S. agency or officer acting in an official capacity." Robbins v. U.S. Bureau of Land Mgmt., 438 F.3d 1074, 1081 (10th Cir. 2006) (internal quotation marks omitted); Simmat v. U.S. Bureau of Prisons, 413 F.3d 1225, 1233 (10th Cir. 2005). While 5 U.S.C. § 702 of the APA waives sovereign immunity, 5 U.S.C. § 702 includes two exceptions to the waiver of sovereign immunity: "Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant

---

[1] The majority also asserts that "Plaintiffs can only sue the BLM to the extent it waived its sovereign immunity." Maj. Op. at 6. Without explanation, the majority "view[s] the question of whether the 1872 Mining Law precludes judicial review against a backdrop of sovereign immunity – if the review cannot be had under the APA due to § 701(a)(1) or (2), the government has not waived sovereign immunity." Maj. Op. at 7 n.4.

relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702; Robbins, 438 F.3d at 1080; Neighbors for Rational Dev., Inc. v. Norton, 379 F.3d 956, 961 (10th Cir. 2004).

Contrary to the district court's and majority's assertions, 5 U.S.C. § 701(a) does not list exceptions to the APA's waiver of sovereign immunity, which are actually listed in 5 U.S.C. § 702. 5 U.S.C. § 701(a) lists two instances where the APA would not apply to agency action, and it does not address the APA's waiver of sovereign immunity. Thus, if the 1872 Mining Law precludes judicial review under 5 U.S.C. § 701(a), as the district court and majority contend, then the APA simply does not apply.

## II.    *There is a strong presumption favoring judicial review*

The APA applies to agency action, unless the relevant "statute[] preclude[s] judicial review." 5 U.S.C. § 701(a)(1). "The APA confers a general cause of action upon persons 'adversely affected or aggrieved by agency action' . . . , but withdraws that cause of action to the extent the relevant statute 'preclude[s] judicial review.'" Block v. Cmty. Nutrition Inst., 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702 and 5 U.S.C. § 701(a)(1), respectively).

The majority incorrectly describes the burden of proof to show preclusion of judicial review pursuant to 5 U.S.C. § 701(a)(1). Without imposing the burden on the agency, the majority observes generally that "[a] presumption of reviewability accompanies agency actions under the APA, but it may be

- 3 -

overcome." Maj. Op. at 7. The majority fails to charge the agency with the burden to establish preclusion, and it fails to apply the strong presumption favoring judicial review.

The agency must demonstrate "nonreviewability," which is the "exception" because "judicial review of such administrative action is the rule." <u>Barlow v. Collins</u>, 397 U.S. 159, 166-67 (1970). More specifically, the agency "bears the <u>heavy burden</u> of overcoming the <u>strong presumption</u> that Congress did not mean to prohibit all judicial review." <u>Dunlop v. Bachowski</u>, 421 U.S. 560, 567 (1975) (emphasis added); <u>Bowen v. Mich. Acad. of Family Physicians</u>, 476 U.S. 667, 670 (1986); <u>McAlpine v. United States</u>, 112 F.3d 1429, 1432 (10th Cir. 1997).

The majority requires a lower evidentiary showing to establish that judicial review is precluded. Despite the strong presumption favoring judicial review, the majority appears to conclude that judicial review is precluded upon a showing of sufficient evidence. Without citation to any authority, the majority suggests that the <u>Block</u> inquiry is equivalent to a review for sufficiency of the evidence: "[W]e look to the <u>Block</u> factors to determine whether there is sufficient evidence of congressional intent to preclude review." Maj. Op. at 10-11; <u>see also</u> <u>id.</u> at 28 ("[W]e find consideration of the other <u>Block</u> factors sufficient to evidence an intent to preclude review."). This standard is incorrect.

In contrast to the standard applied by the majority, the agency must show more than sufficiency of the evidence to show implied preclusion of judicial

- 4 -

review.  The Supreme Court has stated that "only upon a showing of clear and convincing evidence of a contrary legislative intent should the courts restrict access to judicial review."  Abbott Labs. v. Gardner, 387 U.S. 136, 141 (1967) (internal quotation marks omitted); Block, 467 U.S. at 350-51 (explaining that the "'clear and convincing evidence' standard is not a rigid evidentiary test").  The majority narrowly construes Block, contending that "[t]he presumption of judicial review controls where substantial doubt exists about congressional intent on the preclusion issue, but it is hardly conclusive in other circumstances."  Maj. Op. at 7-8 n.5.  Contrary to the majority's assertion, the Court held that "the presumption favoring judicial review [is] overcome, whenever the congressional intent to preclude judicial review is fairly discernible in the statutory scheme."  Block, 467 U.S. 340, 350-51 (1984) (internal quotations omitted).  "[J]udicial review of final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."  Wyoming v. United States, 279 F.3d 1214, 1236 (10th Cir. 2002) (internal quotation marks omitted).  Given the strong presumption favoring reviewability, the Block inquiry requires a more rigorous showing than a mere sufficiency of the evidence.

III.    *The agency has not shown implied preclusion of judicial review*

I also disagree with the majority's application of the Block inquiry to the 1872 Mining Law.  The BLM asserts three arguments in support of implied

preclusion: (1) contemporaneous judicial construction and acquiescence; (2) legislative and judicial history; and (3) statutory scheme. See Block, 467 U.S. at 349. In holding that Congress intended to preclude judicial review, the majority relies upon the legislative and judicial history and the statutory scheme, but not the contemporaneous judicial construction and acquiescence. Maj. Op. at 28. The agency fails to show that Congress intended to preclude judicial review.

*A. Legislative and judicial history*

Because the legislative history and judicial history conflict with the text of the Mining Law, the agency fails to show that judicial review is precluded. Nonetheless, the majority attempts to find preclusion, relying on legislative history of statutes that preceded the enactment of the Mining Law and legislative history that conflicts with the text of the Mining Law.

For example, the majority relies upon the legislative history of the Lode Law of 1866 and the Placer Act of 1870. Maj. Op. at 11. The legislative history of these earlier statutes is irrelevant in determining whether Congress intended to preclude judicial review in the 1872 Mining Law, especially where the Mining Law alone allowed protesters to participate. See 14 Stat. 251, 251-53 (1866); 16 Stat. 217, 217-18 (1870). The majority asserts that the legislative history of the Lode Law and the Placer Act are "extremely relevant" because "Congress intended that the 1872 Mining Law would incorporate these statutes," citing three pages from the congressional debates concerning the 1872 Mining Law. Maj. Op.

at 11 n.7 (citing Cong. Globe, 42nd Cong., 2d Session, at 532-34). Although there are several statements regarding the representatives' concern that the passage of the 1872 Mining Law not affect existing rights under the prior statutes, there is no statement in the congressional debate regarding the "incorporation" of the Lode Law or the Placer Act into the 1872 Mining Law. See Cong. Globe, 42nd Cong., 2d Session, at 532-34.

Moreover, the text of the Mining Law actually conflicts with the majority's selective quotations from the legislative history. In quoting from the legislative history, the majority emphasizes the finality of the patent and a desire to decrease litigation. For example, the majority states that "Congress, in passing the 1872 Mining Law, was in search of a more definite rule because, in part, 'the whole region was in litigation.'" Maj. Op. at 15 (quoting Cong. Globe, 42nd Cong., 2d Session, at 2459). The majority concludes that the "legislative history reflects a clear concern with the finality of the patent." Maj. Op. at 16. From these statements in the legislative history, the majority concludes that "[p]ermitting a challenge by third parties with no interest in the land would allow the kind of lengthy litigation over rights that a patent was designed to avoid." Maj. Op. at 16. But these quotes from legislative history, which serve as the foundation for the majority's ultimate conclusions, conflict with the text and structure of the Mining Law.

While the majority cites scattered comments in the legislative history to

emphasize the finality of the patent and reflect a desire to decrease litigation, the text and structure of the Mining Law actually increased litigation. The Mining Law provides an express cause of action for adverse claimants, who assert ownership interest over the land and are competing for title. 30 U.S.C. § 30. Additionally, the Mining Law allows third parties to participate in the agency proceeding by filing a protest with the BLM to provide evidence as to why the applicant has not satisfied the requirements for a patent. 30 U.S.C. § 29. Congress allowed third-party protesters to participate in the administrative proceeding, even though these third parties claimed no ownership interest in the land, and even though neither the administrative state nor modern principles of standing had developed. Thus, Sections 29 and 30 unquestionably increased litigation over the issuance of a patent by granting adverse claimants a cause of action and allowing third parties to participate in the administrative proceeding. In our preclusion analysis, we should give greater weight to the statute's text, and little, if any, weight to legislative history that conflicts with it.

Just as legislative history does not establish that Congress intended to preclude judicial review, neither does judicial history. In considering judicial history, the majority relies upon cases from the 1880s, but these cases have little, if any, applicability to the questions presented.

None of the majority's cases involve preclusion of judicial review as to a protester's challenge of the BLM's determination. See Beals v. Cone, 188 U.S.

184, 187 (1903); Sparks v. Pierce, 115 U.S. 408, 413 (1885); Steel v. St. Louis Smelting & Refining Co., 106 U.S. 447, 451 (1882); Smelting Co. v. Kemp, 104 U.S. 636, 640-41 (1881); Wight v. Dubois, 21 F. 693, 696 (C.C.D. Colo. 1884). These cases do not support the majority's conclusion that Congress intended to preclude judicial review of the BLM's decisions in the Mining Law.

Additionally, the majority's cases are distinguishable because they concerned the limited concept of standing at the time. See, e.g., Smelting Co., 104 U.S. at 645-47. For example, the majority quotes Wight for the proposition that "'the protestant has no further standing to be heard anywhere. The protest cannot be made the basis of any litigation in the court.'" Maj. Op. at 20 (quoting Wight, 21 F. at 696). But the analysis in Wight rested upon the premise that a protester, in 1884, had no standing to sue in court regarding the issuance of a patent. Wight, 21 F. at 696. Notably, the court's decision in Wight did not concern Congressional intent to preclude judicial review under the Mining Law.

The majority quotes Beals v. Cone, 188 U.S. 184 (1903), for the proposition that the plaintiffs' "'standing in the proceeding was in the nature of amici curioe [sic]'" because they had no ownership interest. Maj. Op. at 21 (quoting Beals, 188 U.S. at 187). But this statement is quoted out of context. In Beals, the Court held that the plaintiff could not invoke res judicata because he was not a party in the prior proceeding, even though he filed a protest. 188 U.S. at 187. The Court held that the protesters, including plaintiff, could not use res

- 9 -

judicata because protesters were not parties, and "[t]heir standing in the proceeding was in the nature of amici curioe [sic]." Id.

Moreover, the Supreme Court's decisions in Smelting Company and Steel are distinguishable because they involved the distinction between courts of law and of equity. See Smelting Co., 104 U.S. at 645-47 (1881); Steel, 106 U.S. at 452-53 (holding that, while the plaintiff could not assail a patent based on a false and perjured affidavit in an action at law, he could seek relief from a court of equity if he had an equitable right to the premises). Thus, although the majority relies upon cases from the 1880s, these cases do not support the majority's conclusion.

The majority bolsters its conclusion using modern judicial history, Maj. Op. at 21-22, but these cases are distinguishable because they did not involve the Mining Law. For example, the majority relies upon Kale v. United States, 489 F.2d 449 (9th Cir. 1973), Maj. Op. at 21, but Kale did not involve the Mining Law. Instead, in Kale, a Chickasaw Indian claimed that the agency improperly denied his allotment petition-application by determining that the land at issue was previously appropriated pursuant to the Soldier's Additional Homestead Rights, 43 U.S.C. § 274. Kale, 489 F.2d at 453-54. Similarly, Leisnoi, Inc. v. United States, 313 F.3d 1181 (9th Cir. 2002), is also cited, but Leisnoi did not involve the 1872 Mining Law. Maj. Op. at 22. Instead, Leisnoi involved a patent issued under the Alaska Native Claims Settlement Act and a suit against the United

States under the Quiet Title Act, 28 U.S.C. § 2409a. 313 F.3d at 1182-83.

While the majority cites United States v. Shumway, 199 F.3d 1093 (9th Cir. 1999), Maj. Op. at 22, the patent discussion in Shumway was dicta, and it did not pertain to preclusion of judicial review under the APA. Shumway involved a patent for mill sites, and the court mentioned that oil, oil shale, gas, and other minerals were subject to a federal leasing system under 30 U.S.C. § 193, and not to the Mining Law after 1920. 199 F.3d at 1100.

Finally, the majority cites Raypath, Inc. v. City of Anchorage, 544 F.2d 1019 (9th Cir. 1976) (per curiam), but Raypath is neither a Mining Law case nor an APA case. Instead, it concerned the issuance of a patent of public lands to the state, and the statute and deed limited the use of the land to "public purposes." Id. at 1021 (citing 43 U.S.C. § 869).

More on point to the issue presented is South Dakota v. Andrus, 614 F.2d 1190 (8th Cir. 1980). The majority did not consider Andrus, where the Eighth Circuit decided the merits of a challenge to a mineral patent under the Mining Law without determining whether the Mining Law precluded judicial review. Id. at 1193. In Andrus, South Dakota had no ownership interest in the mining claim. South Dakota intervened in the agency proceeding, arguing that the Secretary must prepare an environmental impact statement before issuing a patent. The Interior Board of Land Appeals set aside the ALJ's decision on other grounds, but rejected South Dakota's argument. Id. at 1192. South Dakota then filed an

- 11 -

original action in federal district court against the United States Department of Interior and the patent applicant, seeking an order compelling an environmental impact statement. The Eighth Circuit ruled on the merits, holding that BLM's patenting decisions do not require environmental impact statements, and without discussing whether the statute precluded judicial review. Id.

The majority relies upon the legislative and judicial history to conclude that Congress impliedly precluded judicial review: "Given an administrative review process for third-party issues, and the long judicial construction prior to the APA which did not permit judicial review of such claims, we would be hard pressed to conclude that the APA changed this." Maj. Op. at 23-24. Yet again, the majority fails to place the burden on the agency and fails to apply the strong presumption favoring judicial review. Moreover, the majority overstates the holdings of the cases cited, and ignores the conflict between the text and structure of the Mining Law and the legislative history. The legislative history and judicial history do not establish that Congress intended to preclude judicial review.

*B. Statutory scheme as a whole*

Nor does the statutory scheme as a whole establish that Congress intended to preclude judicial review. The majority further concludes that the statutory scheme is "indicative of Congress' intent to preclude review to those with no adverse claim in the patented land," because of the "limited provision for the role of third parties" in the patent process. Maj. Op. at 28. It is true that protesters

did not have a private right of action like adverse parties, but that does not establish that their claims are precluded from judicial review.

Plaintiffs argue that, because Congress provided for third party participation in the administrative process, it did not intend to preclude judicial review. In rejecting this argument, the majority reasons that "Congress, by providing a right of action for adverse claimants, certainly knew how to provide one for unsuccessful protesters." Maj. Op. at 30 (internal citation omitted). In holding that the Mining Law precludes judicial review, the majority relies upon Congress' omission of a right of action in the Mining Law for third parties. For example, the majority states, "[d]espite these many revisions, Congress has not chosen to amend the 1872 Mining Law to provide Plaintiffs with a right of action." Maj. Op. at 27.

But the test for implied preclusion of judicial review is not whether Congress provided an express right of action for the plaintiffs. "[A] plaintiff who lacks a private right of action under the underlying statute can bring suit under the APA to enforce the statute," and he need "not rely upon an implied right of action under any other statute." Hernandez-Avalos v. Immigration & Naturalization Serv., 50 F.3d 842, 846 (10th Cir. 1995). Section 1331 confers federal question jurisdiction "on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdictional predicate." Califano v. Sanders, 430 U.S. 99, 105 (1977); Se. Kan. Cmty. Action Program, Inc. v. Lyng,

967 F.2d 1452, 1455 n.4 (10th Cir. 1992); <u>Wilder v. Prokop</u>, 846 F.2d 613, 618 (10th Cir. 1988); <u>Labash v. U.S. Dep't of Army</u>, 668 F.2d 1153, 1156 (10th Cir. 1982). Thus, the protesters may challenge BLM's action under the APA, regardless of whether the Mining Law includes an express or implied private right of action, and we have federal question subject matter jurisdiction.

Nor does congressional silence demonstrate intent to preclude judicial review. Congress was silent about judicial review for protesters under the Mining Law, but silence is not determinative. "Mere silence in the statute should not be read as precluding judicial review under the APA." <u>Sierra Club v. Peterson</u>, 705 F.2d 1475, 1478-79 (9th Cir. 1983). Contrary to the majority's analysis, congressional silence does not support an inference that Congress intended to preclude judicial review.

Since the third-party protesters would not have had standing to file suit in federal court in the 1880s, it is rather surprising that Congress gave third-party protesters a participation role in the BLM proceeding. Yet the majority concludes that "[t]he limited role that the protesters play in the statutory scheme, coupled with congressional interest in finality and security of title, persuade us that the statutory scheme as a whole suggests an intent to preclude judicial review." Maj. Op. at 30. Of course, the majority reaches this conclusion without first requiring the agency to overcome the strong presumption of judicial review.

Tellingly, the majority seems to disregard the facts of <u>Block</u> itself. In

- 14 -

<u>Block</u>, the Supreme Court held that Congress intended to preclude judicial review for a class of milk consumers because the relevant statute did not allow milk consumers to participate in the administrative process:

> Nowhere in the Act, however, is there an express provision for participation by consumers in any proceeding. In a complex scheme of this type, the omission of such a provision is sufficient reason to believe that Congress intended to foreclose consumer participation in the regulatory process.

<u>Block</u>, 104 U.S. at 347. Because consumers were not allowed to participate at the administrative level, the Court concluded that Congress did not intend to rely on consumers to challenge agency actions. <u>Id.</u> at 346-47. From these facts, the Court found implied preclusion.

Unlike the milk consumers in <u>Block</u>, Congress expressly allowed protesters, as a class, to participate in the regulatory process under the Mining Law, and Congress relied upon third parties to ensure that patent applications complied with the statute by filing protests with the agency. <u>See</u> 30 U.S.C. § 29. Because the Mining Law allows protesters to participate in the administrative process, Congress did not intend to preclude judicial review of protesters as a class. The majority fails to discuss how this case conforms to <u>Block</u>.

*C. Contemporaneous judicial construction and congressional acquiescence*

The majority opinion does not rely upon contemporaneous judicial construction and congressional acquiescence. Congressional intent to preclude review may be inferred from "contemporaneous judicial construction barring

- 15 -

review and the congressional acquiescence in it." Block, 467 U.S. at 349. The majority correctly describes the burden of showing acquiescence. Maj. Op. at 26. To show congressional acquiescence, a claimant "bears the burden of showing abundant evidence that Congress both contemplated and authorized the previous noncongressional interpretation in which it now acquiesces." Catron County Bd. of Comm'rs v. U.S. Fish & Wildlife Servs., 75 F.3d 1429, 1438 (10th Cir. 1996) (internal quotations omitted). "It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." Id. (internal quotation marks omitted). Given this burden, the majority recognizes that the agency falls short, concluding that the "consideration of the other Block factors sufficient to evidence an intent to preclude review." Maj. Op. at 28.

For the reasons stated above, I would conclude that judicial review of the agency action is not precluded.